STATE of Missouri, Appellant,

v.

Richard J. DAMASK, Respondent.

STATE of Missouri, Appellant,

v.

Linda ALVAREZ and Maximo
Garcia, Respondents.

Nos. 78826, 78843.

Supreme Court of Missouri,
En Banc.

Dec. 17, 1996.

Rehearing Denied Jan. 21, 1997.

Penny M. Melton, Assistant Franklin County Prosecuting Attorney, Union, for Appellant, in No. 78826.

Daniel E. Leslie, Union, for Respondent, in No. 78826.

Jeremiah W. (Jay) Nixon, Attorney General, Theodore A. Bruce, Assistant Attorney General, Jefferson City, Thomas M. Johnson, Hickory County Prosecuting Atty., Hermitage, Pat J. Merriman, Assistant Greene County Prosecuting Attorney, Springfield, John J. Garrabrant, Texas County Prosecuting Atty., Houston, for Appellant, in No. 78843.

Thomas D. Carver, Springfield, Scott McBride, Rolla, for Respondents, in No. 78843.

ROBERTSON, Judge.

The question we decide is whether drug enforcement traffic checkpoints operated by law enforcement officials in Franklin and Texas Counties are constitutional under the Fourth Amendment to the United States Constitution and article I, section 15 of the Missouri Constitution. Because the checkpoints were operated in a nondiscriminatory fashion as to the initial stops and because the checkpoints effectively advance an important state interest with minimal intrusion to motorists, we find such checkpoints constitutional. The trial courts' decisions to suppress the evidence seized, based on their readings that the initial checkpoint stops violated the Fourth Amendment, are therefore reversed.

## I.

These cases arise out of two different traffic checkpoint operations. Because the cases present similar legal issues, we consolidate the cases for purposes of opinion. The relevant facts of each case are reported individually.

## A.

### State v. Damask, No. 78826

On November 22, 1994, the Franklin County Sheriff's Department set up a drug enforcement checkpoint at the eastbound I–44 exit 242 where Highway AH crosses I–44 by an overpass. Franklin County had been operating such checkpoints since June 1994 in an attempt to thwart drug trafficking along I–44, a known drug corridor. The checkpoint under scrutiny began operating at 4:00 a.m. and ended at noon.

The sheriff's department placed two signs that read "DRUG ENFORCEMENT CHECKPOINT 1 MILE AHEAD" approximately one-quarter mile west of exit 242, on both sides of the eastbound lanes of I–44. Exit 242 is in a remote area and offers no services to travelers. Eastbound travelers arrive at exit 242 after recently passing exits offering gas, food and lodging services. A motorist would have little reason to leave I–44 at exit 242 unless he/she was a local resident.

Contrary to the signs along the highway, the sheriff's deputies set up the checkpoint at the top of the eastbound exit 242 ramp. Eastbound cars exiting I–44 there climbed the ramp, came to the existing stop sign, and found a uniformed officer waiting. The officer approached the car and informed the driver that the sheriff's department was conducting a drug enforcement checkpoint. Fully marked law enforcement vehicles were directly in front of and thus clearly visible to the stopped driver. The officer checked for a valid driver's license and registration. The officer also asked the motorist the reasons he or she exited there. If the motorist's response and other observations did not arouse reasonable suspicion of drug trafficking, the officer permitted the motorist to proceed. If the circumstances aroused reasonable suspicion, the officer asked the driver for permission to search the vehicle and its contents. If the driver refused, the officers used a drug-sniffing dog to conduct an olfactory examination of the exterior of the automobile. All of these actions followed guidelines prepared by Corporal Michael Schatz of the Franklin County sheriff's department. Corporal Schatz designed the guidelines to channel the officers' conduct to avoid discretionary decisions in the initial stop.

At about 4:20 a.m. on November 22, the first vehicle passed through the checkpoint. The officers approached the Mercury Marquis bearing Nevada license plates and found Richard Damask in the driver's position. Consistent with the written procedure, a uniformed officer approached Damask. Deputy Hotsenpiller, dressed in camouflage gear, also approached the car and questioned Damask. Damask produced a valid Nevada driver's license. When asked why he exited, Damask hesitated and then responded that he was turning around and going back to the last exit to get something to eat. The officers saw empty fast food bags in the car and a cup of warm coffee on the seat beside Damask. Damask appeared nervous, admitted seeing the checkpoint sign and, when asked whether he had drugs, alcohol, or firearms in the car, responded that he had a bottle of alcohol. Hotsenpiller asked for permission to search the car. Damask refused. An officer approached with a police dog to conduct the exterior "sniff" of the car. The dog alerted to the trunk. Inside the trunk, officers found a red duffle bag containing ham-shaped packages that looked like (and actually were) marijuana. The officers arrested Damask. The entire stop and search took approximately five minutes.

The Franklin County sheriff's department continued to operate the checkpoint until noon. A total of sixty-six cars passed through the checkpoint. Each stop averaged two minutes. The officers searched approximately ten cars, including Damask's. Only Damask was arrested.

The state charged Damask with a felony count of possession of marijuana with the intent to distribute, deliver or sell. Damask filed a motion to suppress the evidence, claiming that the stop was unconstitutional and that *Mapp v. Ohio*,[1] required exclusion of the products of the search. After a preliminary hearing, the trial court sustained the motion. The State brought an interlocu-

1. 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

tory appeal of the trial court's ruling. The Court of Appeals, Eastern District, affirmed, holding that the checkpoint operation violated the Fourth Amendment.

## B.

### State v. Alvarez and Garcia, No. 78843

In the second case, Texas County deputy sheriffs stopped Maximo Garcia and Linda Alvarez at a drug interdiction checkpoint on a ramp permitting exit from U.S. 60 to U.S. 63 in Texas County. Although this was the first Texas County checkpoint, Texas County authorities conducted it pursuant to written policies and procedures they adopted after consultation with the Phelps County[2] sheriff, who had operated some twenty to twenty-five checkpoints on the Sugartree exit from I-44 over the previous eighteen months. The Phelps County checkpoints resulted in the seizure of thirty loads of contraband, in addition to other arrests for smaller quantities of drugs.[3] The Texas County sheriff approved the plans before the checkpoint was implemented and the Phelps County sheriff and one of his deputies observed and offered advice on operation of the Texas County checkpoint.

According to the plan, the deputies placed a 4' × 4' sign indicating a "drug checkpoint ahead" 250 yards west of the U.S. 63 exit ramp from U.S. 60. The deputies set up the checkpoint along U.S. 60 because of information the Phelps County sheriff had received from previously arrested drug couriers that drug smugglers had been advised to avoid I-44. U.S. 60 is the major alternative west-east highway across southern Missouri. This particular exit permitted law enforcement officers to wait at a stop sign at the bottom of the exit ramp without being seen by motorists as they passed the sign on U.S. 60. Drivers who wished to avoid the advertised checkpoint could take the exit to U.S. 63, not realizing that the checkpoint awaited them at the exit. No services were advertised at the exit.

All officers at the checkpoint wore uniforms, with the apparent exception of one officer who wore camouflage gear. As each exiting vehicle stopped at the existing stop sign at the bottom of the exit ramp, two officers approached the driver, explained the purpose of the checkpoint and asked the driver's destination, from whence the driver had come, and whether the driver saw the checkpoint sign. The officers allowed any driver who did not want to talk to the officers to proceed. Only if the officer developed a reasonable suspicion of criminal activity from exposure to the motorist did officers check the driver's license, registration, and insurance. Officers were instructed to look for persons who gave conflicting statements in response to questions, who had no identifiable reason for taking the exit or who acted nervously. If, during the brief questioning, the officers developed a reasonable suspicion of criminal activity, the officers asked the person if he or she had any drugs in his or her possession. Law enforcement officers stopped all drivers who exited. Most stops lasted approximately sixty seconds.

Garcia and Alvarez were traveling in a Ford Bronco with Texas plates. They took the exit from U.S. 60 and stopped behind two cars that had already stopped at the stop sign. When the officers approached the Bronco, they noticed a strong smell of deodorant or perfume. In response to the standard question, Alvarez, who appeared nervous, replied that she was going to Branson. When told she was going the wrong way, Garcia interjected that they were actually going to Bertrand, Missouri, and that Alvarez was tired and confused. Parties traveling to Bertrand would have no reason to take the U.S. 63 exit. Alvarez maintained that she had been told to exit U.S. 60 by a flagman, but there was no flagman on that highway.

Alvarez could not produce a driver's license. The officers asked her to pull over to the side of the road. While her name and date of birth were checked, officers walked two drug dogs around the vehicle. The dogs alerted to the spare tire and left tailgate of the Bronco. The officers asked permission

---

**2.** Phelps County is adjacent to Texas County.

**3.** This usually constituted drugs for personal use as opposed to drugs for transport and sale.

to search the vehicle. Alvarez consented. Officers found thirty-seven pounds of marijuana stashed in the spare tire and inside the rear interior panels of the truck. They also found a loaded .380 semi-automatic pistol, which Alvarez claimed was hers, under the dashboard near the steering wheel.

The State charged both Garcia and Alvarez with felony possession of a controlled substance with intent to distribute; the State also charged Alvarez with unlawful use of a weapon. Defendants filed a motion to suppress the pistol and marijuana, and the cases were consolidated for hearing. The trial court sustained the defendants' motions to suppress, finding that the checkpoint violated the Fourth Amendment. The Court of Appeals, Southern District, affirmed. We granted transfer in these cases because of the general interest and importance of the issues raised. We have jurisdiction,[4] reverse the judgment of the trial court, and remand these cases for trial.

## II.

The trial courts suppressed the evidence in these cases on the grounds that the checkpoint stops violated the Fourth Amendment. This Court will affirm the trial courts' decisions to suppress if the evidence is sufficient to sustain those findings.[5] We note, however, that the validity of the initial stop and the validity of any subsequent detention and search are two separate questions.[6] The only issue raised by the parties in their Points Relied On is whether the initial stop of the vehicles at the checkpoint, with its preliminary questioning and observations, violated the Fourth Amendment. Assuming that the initial stop is valid, the subsequent detention and search of defendants' vehicles is also valid, unless there exists no reason-

able individualized suspicion sufficient to warrant detention beyond the initial stop. Defendants, in their Points Relied On, have not suggested that, *subsequent* to the initial stop and preliminary questioning, there were insufficient grounds to warrant further detention for more extensive investigation. The question as to whether any subsequent searches of individual vehicles were based upon the correct constitutional standard of reasonable suspicion is therefore not before this Court.

### A.

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

■ The Fourth Amendment provides the same guarantees against unreasonable searches and seizures as article I, section 15 of the Missouri Constitution.[7] Thus, any analysis of search and seizure questions under the Fourth Amendment is identical to search and seizure questions arising under Missouri law.

■ Properly operated checkpoints are constitutional under the Fourth Amendment.[8] A checkpoint stop such as those at issue here is a seizure under the Fourth Amendment.[9] The Fourth Amendment prohibits only *unreasonable* seizures. The question then becomes whether the seizure was reasonable.[10] The "essential purpose" of the Fourth Amendment protections "is to impose

---

4. Mo. Const. Art. V, § 10.

5. *State v. Miller*, 894 S.W.2d 649, 651 (Mo. banc 1995).

6. *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 450–51, 110 S.Ct. 2481, 2485–86, 110 L.Ed.2d 412 (1990).

7. *State v. Sweeney*, 701 S.W.2d 420, 425 (Mo. banc 1985).

8. *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990); *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *State v. Welch*, 755 S.W.2d 624 (Mo.App.1988); *State v. Vanacker*, 759 S.W.2d 391 (Mo.App. S.D.1988); *State v. Payne*, 759 S.W.2d 252. (Mo.App. E.D. 1988).

9. *Sitz*, 496 U.S. at 450, 110 S.Ct. at 2485

10. *Id.*

a standard of 'reasonableness' upon the exercise of discretion" by law enforcement officials in order to protect the "privacy and security of individuals" from "arbitrary invasions." [11]

■ Generally, seizures that are not based upon a particularized suspicion of criminal activity are unreasonable.[12] However, stopping motorists on public highways may be reasonable even in the absence of particularized suspicion of crime as long as those stops are conducted under certain procedures.[13] The reasonableness of a seizure that is less intrusive than a traditional arrest depends on the balance between the public interest in preventing criminal activity and the individual's right to be free from arbitrary interference by law officers.[14] In addressing this balance, courts must weigh three elements: (1) the gravity of the State's interest served by the checkpoint; (2) the checkpoint's effectiveness in advancing the public interest; and (3) the degree to which the checkpoint interferes with or intrudes upon the motorists.[15] The central concern in balancing these elements is to ensure that a person's "reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of" law enforcement officers.[16]

■ To meet the demands of the Fourth Amendment, seizures must be based either on specific, objective facts indicating the necessity of seizing a particular individual, or the seizure must be carried out in concordance with a plan that provides "explicit, neutral limitations" on the conduct of the law enforcement officers participating in the seizure.[17]

### B.

■ Applying the *Brown* test, we first consider the gravity of the state's interests. The court of appeals assumed, without deciding, that the State's interest in drug interdiction is sufficiently strong to support the use of a drug checkpoint. Drug trafficking has created a "veritable national crisis in law enforcement" [18] and is "one of the greatest problems affecting the health and welfare of our population." [19]

As to the first prong of the *Brown* test, we need say no more. The State's interest in interdicting drug trafficking is beyond serious dispute.

### C.

The second *Brown* prong examines the degree to which the checkpoint effectively promotes the government's purpose. *Galberth v. United States*, without admitting it, states the second *Brown* prong nicely: whether the checkpoint addresses problems predictably associated with persons who are stopped at the roadblock.[20]

■ The question of effectiveness is not a question of whether the checkpoint is the most effective means of achieving the government's objectives, or even that it is more or less effective than other means. It is not for the courts to decide "as to which among reasonable alternative law enforcement techniques should be employed.... [F]or pur-

---

**11.** *Delaware v. Prouse*, 440 U.S. 648, 653–54, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979).

**12.** *Terry v. Ohio*, 392 U.S. 1, 21 & n. 18, 88 S.Ct. 1868, 1879–80 & n. 18, 20 L.Ed.2d 889 (1968).

**13.** *Sitz*, 496 U.S. at 449–450, 110 S.Ct. at 2484–85. This is NOT to say that a detention of the motorist and a subsequent search can be made without at least a reasonable suspicion. A differentiation between the initial stop and a subsequent detention and search is necessary to apply the Fourth Amendment's "reasonable" standard properly. *Sitz*, 496 U.S. at 450–51, 110 S.Ct. at 2485–86; *Welch*, 755 S.W.2d at 627.

**14.** *Brown v. Texas*, 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979).

**15.** *Id.* at 50–51, 99 S.Ct. at 2640–41.

**16.** *Id.* at 51, 99 S.Ct. at 2640.

**17.** *Brown* at 51, 99 S.Ct. at 2640.

**18.** *United States v. Montoya de Hernandez*, 473 U.S. 531, 538, 105 S.Ct. 3304, 3309, 87 L.Ed.2d 381 (1985).

**19.** *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 668, 109 S.Ct. 1384, 1392, 103 L.Ed.2d 685 (1989).

**20.** 590 A.2d 990, 999 (D.C.App.1991).

poses of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers." [21] The courts need only decide whether, balanced with the importance of the governmental interest and the degree of intrusion, checkpoints are at least reasonably effective as a tool in advancing the government's interest.

Neither the United States Supreme Court nor this Court has addressed the specific question whether drug interdiction is a sufficiently important purpose to support a checkpoint or roadblock operation. While there is apparently no case law that upholds the constitutionality of a checkpoint established *solely* to interdict drugs, courts have upheld "dual-purpose" checkpoints where the primary purpose was to interdict drugs, but where license checks, safety inspections, or the like are conducted.[22]

■ Other courts, however, have determined that checkpoints established for the primary purpose of deterring drug crimes are not constitutional because such checkpoints are "addressed to problems of general law enforcement ... not to problems predictably associated with persons who are stopped at the roadblock." [23] Suspicionless stops, such as those that occur at checkpoints and roadblocks, cannot be justified by a general interest in crime control.[24] "Such a justification is antithetical to the Fourth Amendment." [25]

Defendants rely heavily on *Galberth.* They claim that *Galberth* demonstrates that drug interdiction is an insufficient public interest to support a checkpoint operation because a checkpoint does not promote a government interest separate from that of general law enforcement. Defendants, as well as the *Galberth* court, distinguish those cases that uphold sobriety and immigration checkpoints on the grounds that these checkpoints promote government interests separate from that of general law enforcement interests.

One can argue persuasively that sobriety checkpoints relate directly to highway safety. But for the illegal immigration cases, one might agree that *Galberth* correctly states the law and requires affirming the trial court in these cases. *United States v. Martinez–Fuerte*[26] changes the calculus.[27] The flow of illegal drugs presents a law enforcement problem easily as important as that posed by the passage of illegal aliens into this country.

■ To make a showing of effectiveness, the State in this case emphasizes that the arrest ratios at these checkpoints—that is, the number of arrests made per vehicles passing through the checkpoint—were greater than that for the sobriety checkpoint in *Sitz* and the immigration checkpoint in *Martinez–Fuerte*—both constitutionally valid checkpoints. Although *Sitz* and *Martinez–Fuerte* do refer to the number of arrests made, we think the State misreads those cases by assuming that a particular arrest ratio of the particular checkpoint at issue is determinative of whether that same checkpoint is effective. "There is no necessity of

21. *Sitz,* 496 U.S. at 453–54, 110 S.Ct. at 2487.

22. *State v. Everson,* 474 N.W.2d 695 (N.D.1991) (finding that a safety inspection checkpoint, the primary purpose of which was actually drug interdiction, to be constitutional); *Merrett v. Moore,* 58 F.3d 1547 (11th Cir.1995) (holding that a mixed motive roadblock, used primarily to interdict drugs, but also to check driver's licenses and registration, was constitutional).

23. *Galberth v. United States,* 590 A.2d 990, 999 (D.C.App.1991).

24. *Delaware v. Prouse,* 440 U.S. at 659 n. 18, 99 S.Ct. at 1399 n. 18.

25. *Galberth* at 999. *See also United States v. Morales–Zamora,* 974 F.2d 149 (10th Cir.1992) (finding driver's license check to be pretext for stop to search for drugs, and thus unconstitutional); *Hagood v. Town of Town Creek,* 628 So.2d 1057 (Ala.Crim.App.1993).

26. 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)

27. "Interdicting the flow of illegal entrants from Mexico poses *formidable law enforcement problems.*" (Emphasis added.) 428 U.S. at 552, 96 S.Ct. at 3080.

numbers to establish the constitutional validity of such operations."[28]

 Instead, if the State can show generally that similar checkpoint operations effectively advanced the State's interests,[29] and that the particular checkpoint in question was substantially similar to prior successful checkpoints, this is sufficient evidence from which a reviewing court can determine the effectiveness of checkpoint operations under *Brown*. Thus, if similar checkpoints discover "problems [illegal drug trafficking] predictably associated with persons stopped at roadblocks," *Brown's* second prong is satisfied.[30]

Regarding the checkpoints at issue in these cases, the evidence demonstrates that the checkpoints were modeled after the successful drug enforcement checkpoint program in Phelps County. Evidence showed that the checkpoint program in Phelps County had resulted in the seizure of more than thirty "loads" of contraband.

Furthermore, the evidence shows that the particular checkpoints at issue here were planned in such a way so as to increase the likelihood of actually capturing drug traffickers—to discover problems predictably associated with persons who traveled these thoroughfares. The Franklin County checkpoint was set up along I–44, which is known as a popular route for the transport of narcotics.[31] Due to the remoteness of exit 242 and the absence of services at that point, it was unlikely that travelers would exit at that point, unless they were local residents or were trying to avoid the checkpoint presumably a mile further down the interstate, according to the signs.

The Texas County checkpoint was also set up at a rural exit from a four-lane divided highway (U.S.60) to a two-lane highway (U.S.63) at which there were no services advertised. The exit was situated so that motorists on U.S. 60 could not see ahead to

determine whether the drug checkpoint was on U.S. 60 or not. Evidence also demonstrated that Phelps County law enforcement officials, who helped Texas County officials operate the checkpoint, had been told by drug couriers that they had been warned to avoid I–44. A quick glance at a Missouri road map reveals that U.S. 60 is the other major west-to-east roadway across southern Missouri.

The evidence in both cases demonstrates that drug enforcement checkpoints are reasonably effective in advancing the State's interests and that the particular checkpoints in question were modeled after previous successful checkpoint operations and were planned in such a way as to increase the likelihood of discovering drug trafficking predictably associated with persons stopped at this type of focused roadblock.

### D.

 The final element of the *Brown* test is an examination of the intrusion that the checkpoint imposes upon the individual motorists. In making this examination, the courts look at both the objective and subjective intrusion that the motorist encounters.[32] In more precise terms, the degree of objective intrusion looks at factors such as how long the motorist is detained and the intensity of the investigation to which the motorist is subjected.[33] The degree of subjective intrusion looks at the amount of discretion available to the officers in operating the checkpoint and the extent to which a stop may generate concern or fright on the part of lawful travelers.[34] A constitutionally permissible checkpoint will be designed so as to minimize both interference with legitimate traffic and the amount of discretion the field

---

28. *Welch*, 755 S.W.2d at 633.

29. In *Sitz*, for example, the Court upheld the checkpoint in question in part because of the testimony of an expert witness as to the success rate of checkpoints in other states, thereby establishing the efficacy of sobriety checkpoints in general. *Sitz*, 496 U.S. at 455, 110 S.Ct. at 2487–88.

30. *Sitz*, 496 U.S. at 455, 110 S.Ct. at 2487–88.

31. *State v. Burkhardt*, 795 S.W.2d 399, 405 (Mo. banc 1990).

32. *Sitz*, 496 U.S. at 452, 110 S.Ct. at 2486.

33. *Id.*

34. *Id.*

officers may wield in operating the checkpoint.[35]

The degree of objective intrusion at both of the checkpoints in these cases was minimal. Vehicles were stopped, on average, for no more than two minutes. At the Franklin County checkpoint, the initial investigation was limited to a check of license and registration and questions as to whether the driver observed the checkpoint sign and why the driver exited at that point. The Texas County investigation was even more minimal. Drivers were merely asked if they observed the sign, where they were going, and from whence they came. Officers did not even check for a driver's license unless some objective, factual element in the encounter led them to form a reasonable suspicion of criminal activity. Furthermore, any driver who did not wish to talk to the police could immediately proceed.

In addition, both checkpoints were set up and operated so as to minimalize potential traffic congestion. The checkpoints were not set up on the main thoroughfare, but rather at relatively remote exits with low traffic density. Officers stopped no cars on the main thoroughfare. The officers operated the checkpoints at existing controlled intersections where exiting drivers would have been required to stop in any event. The objective intrusion at both checkpoints was minimal.

■ As to subjective intrusion, the critical factor is whether the checkpoint is planned and operated in such a manner as to minimize the amount of discretion that officers at the scene may use in running the checkpoint. Was the checkpoint conducted according to a plan prepared in advance with the input of both field and supervisory personnel? Does the plan designate specific guidelines to be followed by field personnel? Were the terms of the plan adequately disseminated to the field personnel prior to operation of the checkpoint? Were supervisory personnel on hand to oversee the checkpoint? Was the checkpoint location chosen by supervisory personnel for some non-arbitrary reason? And, perhaps most important, were all vehicles stopped or, if not, were there specific, non-discretionary criteria used to generate a random determination as to which vehicles would be stopped, as opposed to some sort of discretionary selection method?

■ A second element is also important to the subjective intrusion analysis: the extent to which the stop might generate concern or fright on the part of lawful travelers. Thus, there should be some prior notice of the existence of the checkpoint. The nature of the checkpoint and the presence of law enforcement personnel should be readily ascertainable to motorists stopped at the checkpoint. Also, the location and layout of the checkpoint should be such that it is safe for drivers to stop.

■ Examining the checkpoints in these cases in the light of these criteria, we find that the subjective intrusion of each checkpoint was minimal. The checkpoints were operated according to plans in existence for about five months prior to the checkpoint operation in question or modeled after existing plans employed in neighboring counties.[36] The plans set forth specific guidelines that limited the officers' discretion regarding operation of the checkpoint, including instructions as to where the checkpoint would be set up, where the signs and any necessary illumination would be placed, how many officers would approach the vehicle, what questions

35. *United States v. Martinez–Fuerte*, 428 U.S. 543, 558–559, 96 S.Ct. 3074, 3083–84, 49 L.Ed.2d 1116 (1976).

36. Damask objects to the fact that the plan was not in writing as of the time the checkpoint at issue was conducted. While it is certainly preferable that a plan be in writing, the important criteria is not that the plan be enscribed somewhere, but rather that the plan contained sufficient concrete guidelines so as to eliminate discretion on the part of the officers in conducting the initial stop and interview, the plan was adequately and timely disseminated to the officers involved, and the plan had received the approval of supervisory officials. As discussed above, all of the evidence indicates that the Franklin County checkpoint plan met those criteria and that the plan was, in fact, conducted in concordance with those criteria. The fact that the plan was not written is not constitutionally fatal.

would be asked, and under what circumstances a subsequent search could be conducted.[37]

Most important, the plans eliminated all discretion as to which cars would be stopped by requiring that all exiting vehicles be stopped. There is no evidence that officers deviated from the guidelines of the plans at the checkpoints under scrutiny here. Furthermore, the checkpoint locations were not arbitrarily chosen but rather selected because they were along known or suspected drug routes. The exits chosen were remote and lacked advertised services, thereby making it more likely that drug couriers would self-select for law enforcement examination. The checkpoint plan and operation virtually eliminated the officers' discretion in stopping vehicles.

The checkpoints were also designed so as to alleviate any fears or concerns of the motorists and to provide for their safety. Large illuminated signs were placed along the main highways to advise drivers of a drug enforcement checkpoint. When drivers used the exits, they were met at the stop sign by a uniformed police officer and law enforcement vehicles were visible. In addition, the checkpoints were at an exit ramp at an existing controlled intersection, thereby reducing the risk of an accident.

We find that the checkpoints in both cases resulted in minimal intrusion with the motorists. Balancing this finding with our determinations that the checkpoints effectively advanced a sufficiently important state interest, we determine, under *Brown,* that the checkpoint operations in Franklin and Texas Counties did not violate the Fourth Amendment of the United States Constitution, nor did they violate article I, section 15 of the Missouri Constitution.

### III.

The trial courts' decisions to suppress the evidence are reversed. These cases are remanded for further proceedings.

HOLSTEIN, C.J., and BENTON, PRICE, LIMBAUGH and COVINGTON, JJ., concur.

WHITE, J., dissents in separate opinion filed.

WHITE, Judge, dissenting.

I do not disagree with everything in the majority opinion. First, I concur completely that trafficking in illegal drugs is a national problem of the most severe kind. And I reject the contention that checkpoints to interdict drug smugglers may never be constitutionally permissible. But ad hoc attempts by local sheriffs to trick highway travelers into leaving the highway in the middle of the night, so that they can be interrogated in remote areas by armed, camouflage-clad men with dogs, do not meet the test of reasonableness established by the United States Supreme Court for seizures without individualized suspicion. Thus, respectfully, I dissent.

### Standard of Review

In suppression hearings this Court has been unwilling to question the factual basis upon which the conclusions of the hearing court are based. In a checkpoint case where the trial court refused to suppress evidence, the Court held that "[o]n review, the appellate court considers the facts and the reasonable inferences of those facts in light most favorable to the trial court's ruling."[1] Additionally, since a checkpoint stop, like a *Terry* stop, is made without probable cause or a warrant, indeed is made without even the reasonable suspicion that *Terry* requires,[2] the burden of proof must be on the State to demonstrate the facts justifying a warrant-

---

37. *Damask* also contends that the officers were able to use their unbridled discretion in determining which cars would be *searched.* The plan provided that officers could decide to search a car if they had reasonable suspicion that criminal activity was going on. It is this standard of reasonable suspicion which curbs the officer's discretion. *Terry v. Ohio,* 392 U.S. at 21, 88 S.Ct. at 1879–80 It is not necessary that officers have a checklist of criteria which must be met before a search can be conducted.

1. *State v. Rodriguez,* 877 S.W.2d 106, 110 (Mo. banc 1994).

2. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

less seizure.[3] Yet the majority opinion repeatedly characterizes the evidence in favor of the State, and against the rulings of the suppression courts.[4] For instance, the majority concludes that "all of the evidence indicates that the plan" in Franklin County contained specific, concrete guidelines to eliminate the discretion of officers, was disseminated to them and had received the approval of responsible officials, and was "conducted in concordance with those criteria."[5] A more balanced look at the evidence would suggest that the plan was not formalized or approved by high-ranking personnel until after the seizure at issue here, that officers may have deviated from the plan by treating local motorists differently from out-of-state motorists, and that uniformed personnel and marked cars may not have been visible to detainees. And certainly, a view of the facts which is, as ours must be, slanted towards suppression cannot support the legal conclusions reached by the majority.

### Reasonableness

As I note above, I endorse the majority's conclusion that drug trafficking is an important national problem. The State's interest here is at least as great as in checkpoints approved by the United States Supreme Court.[6] As to the effectiveness and intrusiveness of these seizures, however, I find that they are much closer to the discretionary investigatory stops forbidden in *Delaware v. Prouse*[7] than the well-planned, well-controlled, non-threatening checkpoints approved in *Sitz* and *Martinez–Fuerte*.

As the majority notes, one factor that must be considered in evaluating the reasonableness of a suspicionless seizure is "the degree to which the seizure advances the public interest[.]"[8] I am not unmindful of the *Sitz* Court's admonition that "[t]his passage from *Brown* was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger."[9] The *Sitz* Court clearly envisioned an articulated and accountable decision-making process. In the Franklin County checkpoint the evidence does no more than demonstrate that two low-level officers (a deputy and a corporal) heard about a checkpoint program in a nearby county and decided to organize and implement their own version. At the suppression hearing, no evidence appeared to show that any "[e]xperts in police science" or "governmental officials who have a unique understanding of, and a responsibility for, limited public resources" decided that this was a reasonable means to stop drug trafficking.[10] In fact, no evidence was presented to show that this operation was approved by "politically accountable" officials until after the arrest at issue here was made. The after the fact rationalizations the majority attempts to supply are insufficient. Without questioning the Court's expertise in this area, the fact that it was willing to take

---

3. *See State v. Miller,* 894 S.W.2d 649, 654 (Mo. banc 1995).

4. *See, e.g.* Op. at 573–574 (holding that "evidence demonstrates that the checkpoints were modeled after the successful program in Phelps County[,]" that "evidence shows that the particular checkpoints at issue here were planned in such a way as to increase the likelihood of actually capturing drug traffickers[,]" that "[e]vidence also demonstrated that Phelps County law enforcement officials, who helped Texas County officials operate the checkpoint, had been told by drug couriers that they had been warned to avoid I–44. A quick glance at a Missouri road map reveals that U.S. 60 is the other major west-to-east roadway across southern Missouri."); Op. at 575 (holding that there is "no evidence that officers deviated from the guidelines," that "checkpoint locations were not arbitrarily chosen but rather selected because they were along known or suspected drug routes," and that "[w]hen drivers used the

exits, they were met at the stop sign by a uniformed police officer and law enforcement vehicles were visible.").

5. Op. at 574 n. 35.

6. *See United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990).

7. 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).

8. *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979).

9. *Sitz,* 496 U.S at 453, 110 S.Ct. at 2487.

10. *Id.* at 453–54, 110 S.Ct. at 2487.

judicial notice, without mentioning any factual basis, that Interstate 44 was a "notorious route used by drug traffickers" in 1988 [11] does not amount to empirical evidence to support an abridgment of fundamental rights. I suppose the majority opinion will now be cited as a conclusive determination that Highway 60 is a known alternative drug corridor. But this finding is based upon nothing more than the hearsay report of a drug courier. If the Court is to put such weight on this "evidence," must we not also believe that Interstate 44 is no longer a drug corridor, since we have such an authoritative report that drug couriers now avoid it? The State has not demonstrated that the suppression courts could not have found that it presented no credible, empirical evidence to show the effectiveness of checkpoints like these.

Of more grave concern is the intrusiveness of these stops to law-abiding citizens. The *Prouse* Court found that the circumstances surrounding the stops, rather than the intrusiveness of the interrogation itself, were the critical difference between allowable seizures and forbidden ones:

> The crucial distinction was the lesser intrusion upon the motorist's Fourth Amendment interests: "[The] objective intrusion—the stop itself, the questioning, and the visual inspection—also existed in roving-patrol stops. But we view checkpoint stops in a different light because the subjective intrusion—the generating of concern or even fright on the part of lawful travelers—is appreciably less in the case of a checkpoint stop." [12]

At roadblock checkpoints "all vehicles are brought to a halt or to a near halt, and all are subjected to a show of the police power of the community.... '[T]he motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion.'" [13] It is difficult to envision a scenario more likely to engender fright or confusion in an innocent highway traveler than the Franklin County checkpoint. At 4 a.m., following the appearance of an obviously temporary, poorly-illuminated sign warning of a checkpoint in a totally isolated area, an exiting motorist finds himself accosted, in a different location, by two armed men in camouflage fatigues, one with a dog. It was disputed whether a uniformed officer always stopped the cars, and marked cars may or may not have been visible to the motorist. Officers also testified that they shined a flashlight into the faces of detainees, possibly making it difficult for them to evaluate the situation. There is no testimony that many of the detainees saw other motorists had been stopped, and a very small fraction of the drivers on the interstate were detained. This is much closer to the too-intrusive seizures described in *Prouse,* which "generally entail law enforcement officers signaling a moving automobile to pull over to the side of the roadway, by means of a possibly unsettling show of authority. Both [discretionary license and registration checks and roving border patrol stops] interfere with freedom of movement, are inconvenient, and consume time. Both may create substantial anxiety." [14] Viewing the facts in the light most favorable to the trial courts' rulings, the intrusiveness of the stops the Court approves today is greater than that in stops rejected by the United States Supreme Court.

In testing for reasonableness, the Court's chief aim is "to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." [15] The testimony of the Franklin County officers indicates that the men who operated the checkpoint were responsible for organizing the operation and developing the plan for officer conduct. It is not clear that high-ranking officials were involved in the imple-

---

**11.** *State v. Burkhardt,* 795 S.W.2d 399, 405 (Mo. banc 1990).

**12.** *Prouse,* 440 U.S at 656, 99 S.Ct. at 1397 (quoting *Martinez–Fuerte,* 428 U.S. at 558, 96 S.Ct. at 3083).

**13.** *Id.* at 657, 99 S.Ct. at 1398 (quoting *United States v. Ortiz,* 422 U.S. 891, 894–95, 95 S.Ct. 2585, 2588, 45 L.Ed.2d 623 (1975)).

**14.** *Id.*

**15.** *Brown,* 443 U.S. at 51, 99 S.Ct. at 2640.

mentation of the plan at all. The United States Supreme Court does not trust the judgment of field officers in such matters: "the Fourth Amendment requires that a seizure ... must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." [16] Even assuming that the written plan meets this high standard, it was not reduced to writing for approval by the sheriff until after the seizure occurred. The evidence that explicit, neutral controls were in place to channel police conduct, and these controls were followed, consisted solely of the contradictory testimony of the field officers who carried out the checkpoint, and who designed the plan in the first place. Given that the Court is bound to consider the facts in the light most favorable to suppression, I cannot find that controls sufficient to channel officer discretion were established and were observed.

### Conclusion

While I do not think that drug-smuggling checkpoints are inherently unconstitutional, the checkpoints the Court sanctions today are designed in such a way as to engender fright and concern in law-abiding motorists. Also, the facts, viewed in the light most favorable to the trial courts' rulings, demonstrate neither empirical evidence of checkpoint effectiveness, nor that explicit, neutral guidelines for police conduct were issued and followed. The trial courts had sufficient evidence to hold that the checkpoints were conducted in an unreasonable fashion, and therefore, in violation of the Fourth Amendment.