STATE of Missouri, Plaintiff–Appellant

v.

Anthony Lee PARISH, Defendant–Respondent.

No. 20683.

Missouri Court of Appeals, Southern District, Division Two.

Jan. 6, 1997.

Patrick L. King, Prosecuting Attorney, Phelps County, Rolla, for plaintiff-appellant.

David L. Mills, District Defender, Rolla, for defendant-respondent.

PARRISH, Judge.

This is an appeal by the state of an order granting a motion to suppress evidence. § 547.200, RSMo 1994. The trial court granted the motion of Anthony Lee Parish (defendant) to suppress all items of physical evidence seized in connection with the operation of a drug checkpoint by the Sheriff of Phelps County. The trial court held that the initial checkpoint stop violated the Fourth Amendment to the United States Constitution. This court reverses and remands for further proceedings.

Defendant was driving an automobile eastbound on I–44 at approximately 4:30 a.m. the morning of May 12, 1994, in Phelps County when he observed a lighted sign at a location visible to eastbound travelers. The sign read, "Drug Enforcement Check Point Ahead One–Fourth Mile." The Sugar Tree Road exit was approximately 150 to 200 yards beyond the sign. Defendant exited I–44 at Sugar Tree Road.

The checkpoint was set up at the top of the Sugar Tree Road exit ramp—there was no checkpoint on I–44. The primary purpose for the checkpoint was to locate illegal drugs, although the officers operating the checkpoint also looked for other things.[1] Sheriff Donald Blankenship was standing near the stop sign. Sheriff Blankenship testified that he was wearing either a standard sheriff's department uniform or camouflage pants and a black shirt with "Sheriff" written in large reflecting letters across its front and back.

Deputy Sheriff David Rightnowar was also present at the checkpoint.[2] He was wearing either a standard sheriff's department uniform or other clothing identifying him as a law enforcement officer. Another deputy sheriff, Pete Landry, was at the checkpoint from time to time. When Officer Landry was at the checkpoint, he was attired similarly to Sheriff Blankenship and Officer Rightnowar. Sheriff Blankenship was not sure if Officer Landry was at the checkpoint when defendant was stopped.

A marked sheriff's car was parked near the stop sign. The car was visible to drivers as their cars approached the stop sign.

Defendant was driving a black Fiero automobile with Arizona license plates. When he stopped for the stop sign, Officer Rightnowar approached defendant's car on the driver's side. Officer Rightnowar engaged defendant in conversation for less than a minute when Sheriff Blankenship approached the driver's side of the car. The sheriff noticed the interior of the car smelled like deodorizers. He detained defendant while a dog trained to react to the odor of marijuana went around defendant's car. The dog reacted to the car. The officers searched the car and found mar-

---

1. Sheriff Donald Blankenship explained, "We get a lot of driving while revoked, driving while suspended, warrants, stolen vehicles, a variety of things."

2. The deputy sheriff's name is spelled "Rightnowar" in the transcript and the state's brief. It is spelled "Rightenour" in the defendant's brief. This opinion uses the spelling that appears in the transcript.

ijuana in a luggage carrier mounted on its top.

The procedures used in operating the checkpoint included checking all cars when they stopped for the stop sign at the eastbound Sugar Tree Road exit. The officer who approached the cars checked licenses then asked the drivers where they were going, where they were coming from and why they exited at that point.

The trial court held that the stop violated defendant's "fourth amendment constitutional rights against unreasonable searches and seizures." The validity of the search that followed the preliminary stop was not addressed. Accordingly, there is no issue before this court concerning the search.[3]

The state argues the trial court erred in granting the motion to suppress evidence; that what occurred was not a "stop" for Fourth Amendment purposes, or alternatively, that the stop was made at a checkpoint under circumstances that are permissible under the Fourth Amendment.

The checkpoint in question was a seizure under the Fourth Amendment. *See State v. Damask*, 936 S.W.2d 565 (Mo. banc 1996).

Properly operated checkpoints are constitutional under the Fourth Amendment. A checkpoint stop such as those at issue here is a seizure under the Fourth Amendment. The Fourth Amendment prohibits only *unreasonable* seizures. The question then becomes whether the seizure was reasonable. The "essential purpose" of the Fourth Amendment protections "is to impose a standard of 'reasonableness' upon the exercise of discretion" by law enforcement officials in order to protect the "privacy and security of individuals" from "arbitrary invasions."

Generally, seizures that are not based upon a particularized suspicion of criminal activity are unreasonable. However, stopping motorists on public highways may be reasonable even in the absence of particularized suspicion of crime as long as those stops are conducted under certain proce-

dures. The reasonableness of a seizure that is less intrusive than a traditional arrest depends on the balance between the public interest in preventing criminal activity and the individual's right to be free from arbitrary interference by law officers. In addressing this balance, courts must weigh three elements: (1) the gravity of the State's interest served by the checkpoint; (2) the checkpoint's effectiveness in advancing the public interest; and (3) the degree to which the checkpoint interferes with or intrudes upon the motorists. The *central concern* in balancing these elements is to ensure that a person's "reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of" law enforcement officers.

To meet the demands of the Fourth Amendment, seizures must be based either on specific, objective facts indicating the necessity of seizing a particular individual, or the seizure must be carried out in concordance with a plan that provides "explicit, neutral limitations" on the conduct of law enforcement officers participating in the seizure.

*Id.* at 570–71 [footnotes omitted].

*Damask* holds that the state has an interest in interdicting drug trafficking and that drug enforcement checkpoints of the type utilized in this case are reasonably effective in advancing that interest. *Id.* at 571–72, 573–74. These are the requisite elements for satisfying prongs (1) and (2) of the test.

To determine whether a checkpoint satisfies prong (3) of the test, the degree to which a particular checkpoint interferes with or intrudes upon motorists, it is necessary to review its operation. Its intrusion upon motorists must be reviewed objectively and subjectively.

[T]he degree of objective intrusion looks at factors such as how long the motorist is detained and the intensity of the investigation to which the motorist is subjected. The degree of subjective intrusion looks at the amount of discretion available to the officers in operating the checkpoint and

---

**3.** "Assuming that the initial stop is valid, the subsequent detention and search ... is also valid, unless there exists no reasonable individual- ized suspicion sufficient to warrant detention beyond the initial stop." *State v. Damask*, 936 S.W.2d 565, 570 (Mo. banc 1996).

the extent to which a stop may generate concern or fright on the part of lawful travelers. A constitutionally permissible checkpoint will be designed so as to minimize both interference with legitimate traffic and the amount of discretion the field officers may wield in operating the checkpoint.

*Id.* at 573–74 [footnotes omitted].

In this case brief preliminary inquiries were made of drivers and requests were made to inspect their driver's licenses. The location of the stop, a low traffic, rural off-ramp, avoided problems of traffic congestion. Traffic was neither stopped nor backed up along the interstate highway. The checkpoint was operated at an intersection where drivers were otherwise routinely required to stop. As in *Damask*, the degree of objective intrusion was minimal.

There were no written guidelines for the operation of this checkpoint. Sheriff Blankenship testified, however, that standard operating procedures were followed. The procedures were that all vehicles exiting I–44 at the Sugar Tree Road exit were checked; the drivers were asked about their points of origin and destinations; driver's licenses were checked. The checkpoint was operated under Sheriff Blankenship's supervision. He was physically on site.

Pitfalls are more easily avoided if there are written operational guidelines for checkpoints and if formal orientations are provided officers who will be participating in checkpoint operations. However, underlying constitutional requirements are the existence of standard operating procedures and approval of the procedures by an appropriate authorizing official. *See Damask, supra*, 936 S.W.2d at 574–75 n. 36. Absence of a written plan is not constitutionally fatal. *Id.*

Here, there was no discriminatory purpose for choosing the checkpoint location. There was no discriminatory method for selecting what vehicles were stopped—all were stopped. There was no cause for fright by motorists who came upon the checkpoint. There was prior notice provided by the lighted sign posted near the Sugar Road Tree exit. The identity of persons operating the checkpoint as law enforcement officers was evident from their attire and the presence of a marked sheriff's department vehicle.

The checkpoint resulted in minimal intrusion. It did not violate the Fourth Amendment of the United States Constitution. The order granting defendant's motion to suppress evidence is reversed. The case is remanded for further proceedings.

PREWITT, P.J., concurs in separate opinion filed.

CROW, J., concurs.

PREWITT, Presiding Judge, concurring.

Decisions of the Supreme Court are controlling in this Court. Mo. Const. art. V, § 2. Therefore, I am compelled to concur in light of *State v. Damask*, 936 S.W.2d 565 (Mo. banc 1996). My personal views are more akin to Judge White's dissent in *Damask.*