MISSOURI COURT OF APPEALS
 WESTERN DISTRICT

 )
STATE OF MISSOURI, )
 ) WD83384
 Respondent, )
 v. ) OPINION FILED:
 )
GODFREY K. KIRUI, ) March 2, 2021
 )
 Appellant. )
 )

 Appeal from the Circuit Court of Jackson County, Missouri
 Honorable Kevin Harrell, Judge

 Before Division One:
 Alok Ahuja, P.J., Thomas H. Newton, and Thomas N. Chapman, JJ.

 Summary

 Mr. Godfrey Kirui appeals his convictions, after a bench trial, of R ape in the

first degree, §566.030 RSMo1; Kidnapping in the first degree §565.110 RSMo; Assault

in the third degree, §565.070 RSMo; and Tampering with a Motor Vehicle in the first

degree, §569.080 RSMo. Mr. Kirui was sentenced to 20 years imprisonment for r ape,

consecutive to 15 years imprisonment for kidnapping, one year for assault, and seven

years imprisonment for tampering with a motor vehicle, which were ordered to run

concurrently. We affirm.
 Factual and Procedural Background

 Mr. Kirui was convicted, after a bench trial, of rape in the first degree,

kidnapping in the first degree, assault in the third degree, and tampering with a motor

vehicle in the first degree. The following facts were adduced at trial. T.M. joined her

fiancé and two friends for a birthday celebration at a Kansas City area nightclub in

November 2016. After leaving the nightclub, at 2:25 a.m., T.M., her fiancé and only

one friend entered their SUV and her fiancé started the vehicle. When they realized the

other friend had not left the nightclub with them, T.M.’s fiancé left the SUV to go back

inside the club. T.M. rested her head on the front passenger window and recalled

hearing her friend exit the vehicle, leaving her in the unlocked car alone. Shortly after,

T.M. heard someone get into the driver’s side but did not look up immediately. By the

time she looked up, the vehicle was traveling down the street, and she did not recognize

the person driving. T.M. told Mr. Kirui he was in the wrong vehicle but he kept

repeating that he was going to take her home. T.M. growing frantic, swung her fist at

Mr. Kirui hitting him in the face. Mr. Kirui hit her back and T.M. grabbed the steering

wheel and pulled it to the right as hard as she could. The vehicle went off road , hit a

tree and came to a stop. Mr. Kirui got out of the vehicle and as T.M. was trying to exit

the vehicle he met her at the passenger door and attac ked her.

 Mr. Kirui overpowered T.M. and shoved her upper body unto the bottom of the

passenger seat with her legs pointing out of the car. T.M. testified that Mr. Kirui

dropped his pants and succeeded in pulling her shorts around her knees and her panties

down. T.M. continued to fight Mr. Kirui and because of this he was only able to insert

his penis into her vagina an inch or so. Mr. Kirui also put his mouth on T.M.’s face, ear

 2
and cheek. The sexual assault came to an end within five minutes when Mr. Kirui saw

red and blue police lights. Mr. Kirui threw T.M. out of the car and climbed through the

passenger side to sit in the driver’s seat. Mr. Kirui tried to drive off but failed, and was

taken into custody at 2:50 a.m.

 Mr. Kirui was taken to Shoal Creek Patrol Division station. About 4:15 a.m. Mr.

Ben Simmons, Crime Scene Technician, searched Mr. Kirui for perishable evidence,

including combing his head and pubic hair, swabbing his hands, neck, penis, and

scrotum. Mr. Simmons testified that Mr. Kirui was cooperative during the process. Mr.

Simmons did not observe or document any injuries, tears in his clothes, or fluids on his

clothes.

 T.M. was taken to St. Luke’s Hospital by ambulance. T.M. turned over her

clothes and underwent a sexual assault forensic examination (SAFE) by a sexual assault

nurse examiner (SANE), Ms. Shannon DePuy. Photographs were entered into evidence

without objection showing T.M.’s ripped panties and ripped skirt lining. Ms. Emily

Warren, a forensic specialist with the Kansas City Police Department (KCPD) Crime

Lab, found no male DNA present in T.M.’s vaginal swabs. The swab of T.M.’s neck

contained DNA from T.M. and Mr. Kirui. Ms. Warren performed a statistical analysis

to describe how strong that particular match was. “. . . the expected frequency of Profile

A was 1 in 89 octillion unrelated individuals” which met the threshold for making a

source identification. The penile swabs indicated the presence of DNA from three

contributors but the major contributor was Mr. Kirui. Based on Ms. Warren ’s statistical

analysis, there was extremely strong statistical support for T.M. being the minor female

contributor to the DNA taken from Mr. Kirui’s penis.

 3
Motion to Suppress

 Mr. Kirui filed a pro se motion to suppress, and later his counsel filed a

supplemental motion to suppress incorporating Mr. Kirui’s earlier pro se motion

arguing that the foreign DNA swab was an illegal search and be suppressed. The State

made the responsive argument that the search was lawful because it met the exigent

circumstances exception and the search was incident to a lawful arrest. At the

suppression hearing, the State called Officer Luke Abouhalkah of the KCPD and

adduced this testimony:

 Q. And what did you observe?

 A. I observed two people. When I pulled up to the vehicle, I observed a front
 passenger door swing open and two people toppled down on the ground, a male and
 a female. The -- both the male and the female had their pants down below their
 waist. At that point in time I knew that there was something going on amiss.

 Q. Why did you think something was going on and why did you think something
 was amiss?

 A. I heard a female screaming help me. Help me. Help me. Multiple times.
 ...

 Q. Okay. What happened next?

 A. What happened next was I tried to approach. The female was down on the
 ground. The male kind of pushed himself back off the ground and jumps back in
 the vehicle with the door still open, front passenger door still open, and at that point
 in time, I basically was telling him to -- to stop and to put his hands up and get out
 of the vehicle, and instead, he attempted to take off and leave from the scene.

Detective Duston Burnett of the Kansas City Police Department (KCPD), went to

collect perishable evidence from Mr. Kirui at the Shoal Creek station. Detective Burnett

testified that he did not request Mr. Kirui’s consent to collect DNA swabs because they

are perishable items and Mr. Kirui had the potential to destroy evidence. Additionally,

it would have taken about 4 hours to obtain a warrant.

 4
The motion court denied Mr. Kirui’s motion stating:

 After full consideration of Defendant’s Motion to Suppress Physical
 Evidence filed October 9, 2018, the State’s Response and Suggestions in
 Opposition to Defendant’s Motion to Suppress Evidence filed February
 19, 2019, and a full hearing heard on July 25, 2019, the Court hereby finds
 due to the totality of the circumstances, exigent circumstances existed to
 justify the warrantless collection of Defendant’s DNA.

 At trial, Mr. Kirui’s counsel renewed the motion to suppress and objections made

to the DNA search without a warrant and the trial court again overruled it. Mr. Kirui

appeals.

 Legal Analysis

 In the sole point relied on, Mr. Kirui contends the trial court clearly erred in

failing to suppress and in overruling the objections at trial to the evidence obtained by

swabbing his hands, neck, penis and scrotum and all testimony concerning that

evidence, in that the evidence was seized in violation of the Fourth Amendment right

to be free from unreasonable searches and seizures.

 We review a trial court's decision on a motion to suppress evidence to
 determine whether substantial evidence exists to support the trial court's
 ruling. We will reverse the trial court's judgment only if it is clearly
 erroneous. To find clear error, an appellate court must be “left with a
 definite and firm belief a mistake has been made.” This Court considers
 the record made at the suppression hearing and at trial, and we “review
 all facts and reasonable inferences therefrom in the light most favorable
 to the trial court's decision.” We defer “to the trial court's superior
 opportunity to determine the credibility of witnesses.”

State v. Bell, 488 S.W.3d 228, 238 (Mo.App. E.D. 2016)(citations omitted).

 This Court defers to the motion court’s factual findings and credibility

determinations, limiting its inquiry to whether the motion court ’s decision was

supported by substantial evidence. State v. Rousan, 961 S.W.2d 831, 845 (Mo. banc

1998). In “reviewing the trial court's overruling of a motion to suppress, this Court

 5
considers the evidence presented at both the suppression hearing and at trial to

determine whether sufficient evidence exists in the record to support the trial court's

ruling.” State v. Pike, 162 S.W.3d 464, 472 (Mo. banc 2005).

 Exigent Circumstances Exception

 The United States Constitution and the Missouri Constitution both afford

individuals the same level of protection from unreasonable searches and seizures. State

v. Damask, 936 S.W.2d 565, 570 (Mo. banc 1996). “One well-recognized exception,”

and the one at issue in this case, “applies when the exigencies of the situation make the

needs of law enforcement so compelling that a warrantless search is objectively

reasonable under the Fourth Amendment.” Missouri v. McNeely, 569 U.S. 141, 148–49

(2013).

 A variety of circumstances may give rise to an exigency sufficient to
 justify a warrantless search, including law enforcement's need to provide
 emergency assistance to an occupant of a home, engage in “hot pursuit”
 of a fleeing suspect, or entering a burning building to put out a fire and
 investigate its cause. As is relevant here, we have also recognized that in
 some circumstances law enforcement officers may conduct a search
 without a warrant to prevent the imminent destruction of evidence. While
 these contexts do not necessarily involve equivalent dangers, in each a
 warrantless search is potentially reasonable because “there is compelling
 need for official action and no time to secure a warrant.”

Id. at 149 (citations omitted).

 Mr. Kirui argues that under the totality of circumstances, that he was locked in

a cell by himself with no access to water, Detective Burnett did not have an objective

and reasonable fear that the DNA evidence would be destroyed before a warrant could

be obtained. The State argues that under Schmerber v. California, 384 U.S. 757, 767-

 6
72 (1966) 1, Detective Burnett’s decision to collect the DNA evidence without a warrant

was “justified in the circumstances” and was a relatively minor intrusion on the

defendant's privacy interests. The State also relies on other jurisdictions that have held

exigent circumstances can justify a warrantless examination of a sexual assault

suspect’s genitals. 2 the notion that the collection of evidence from a person’s genitalia

is a minor intrusion.

 Even though we reject the State’s argument that the collection of evidence from

a person’s genitalia is a minor intrusion, under the totality of the circumstances, the

trial court did not err in overruling the motion to suppress or admitting the foreign DNA

evidence and testimony at trial. First, Mr. Kirui was arrested immediately after the rape; both

T.M. and Mr. Kirui’s pants were still down when the police arrived; T.M. was screaming for help,

distraught and crying when the police arrived. These facts are indicative of DNA evidence being

currently present on the Mr. Kirui at the time of arrest. Detective Burnett testified that he

believed that Mr. Kirui had the potential to destroy T.M. ’s DNA, perishable evidence,

before a warrant could be issued. He further testified that in the early morning hours

1
 Where defendant had been arrested in connection with an automobile accident and suspected of
driving under the influence. The Supreme Court stated:
 The officer in the present case, however, might reasonably have believed that he was
 confronted with an emergency, in which the delay necessary to obtain a warrant, under the
 circumstances, threatened ‘the destruction of evidence. . . Given these special facts, we
 conclude that the attempt to secure evidence of blood -alcohol content in this case was an
 appropriate incident to petitioner's arrest.

Schmerber v. California, 384 U.S. 757, 770–71 (1966).
2
 Other courts have concluded exigent circumstances can justify a warrantless examination of a sexual-
assault suspect's genitals. (See Ontiveros v. State, 240 S.W. 3d 369, 371-372 (Tex. Ct. App. 2007)
[warrantless swabbing of defendant's penis was justified; although handcuffed, defendant could have
urinated in his pants and damaged fragile DNA evidence]; Kaliku v. United States, 994 A. 2d 765, 779-
781 (D.C. Ct. App. 2010) [warrantless swabbing of defendant's penis was justified because DNA
evidence could have been contaminated or wiped or rubbed away]; see also Commonwealth v. Banville
(2010) 931 N.E. 2d 457, 465, fn. 2 [genital swab and combing of pubic hair was urgent because dela y
could have resulted in destruction of evidence; although warrant was obtained, search would have been
valid as warrantless search incident to arrest].

 7
when Mr. Kirui was arrested, it takes approximately four hours to prepare a warrant

application, present it to a judicial officer, obtain a warrant, and execute it. Detective Burnett also

testified that his unit generally attempts to collect such swabs within two hours, because the suspect

is being kept away from water and bathroom facilities. It is significant that Mr. Kirui was arrested

in the early morning, after taking a car from outside a nightclub. There was an appreciable risk

that, with a four-hour delay in swabbing, Mr. Kirui would urinate and destroy DNA evidence in

his genital area (whether intentionally or not). We also note that Mr. Kirui had attempted to flee

from police at the crime scene, suggesting that he would be willing to take any available action to

frustrate his arrest or successful prosecution. Finally, given T.M.’s description of the rape and the

limited extent to which Mr. Kirui was able to penetrate her vagina, police could reasonably

conclude that only small amounts of genetic material had been deposited on Mr. Kirui’s skin, and

that those materials could easily disappear. (The fact that no DNA was recovered from T.M.’s

vaginal swab, or apparently from the samples collected from Mr. Kirui’s scrotum or pubic hair,

indicates that little biological material was exchanged between T.M. and Mr. Kirui during the

sexual assault.). Ms. Warren testified how there are “many scenarios” in which Mr. Kirui

could have destroyed the evidence:

 Q. Okay. How can DNA foreign to a primary source be manipulated?

 A. So there's many different ways it can be removed. If there's any sort of
 washing, that can remove foreign DNA. If there's any sort of rubbing or friction
 that could cause that DNA to be removed. If it is foreign DNA on a body, if the
 source person is sweating heavily, that could also cause it to be removed. If it is
 foreign DNA deposited on an area that's covered by clothing, that clothing could
 rub against the body and remove some of that foreign DNA. So there are many
 scenarios which could cause foreign DNA to be removed very easily.

 Q. And that's why it's called perishable evidence?

 A. Yes.

 8
At trial, Ms. Warren confirmed the possibility of urination destroying DNA evidence

on genitals. Further, Mr. Kirui was cooperative and the swabs were performed by

professionals and in the least intrusive manner, justifying under the circumstances , a

minor intrusion on the defendant's privacy interests. In the circumstances of this case,

the exigencies of perishable DNA evidence made the needs of law enforcement so

compelling that a warrantless search was objectively reasonable under the Fourth

Amendment. 3

 Conclusion

 Considering the evidence presented at both the suppression hearing and at trial

we find sufficient evidence exists in the record to support the trial court's ruling.

 /s/ Thomas H. Newton
 Thomas H. Newton, Judge

Alok Ahuja, P.J. and Thomas N. Chapman, J. concur.

3
 Nothing is more intrusive than a search of a person's genitalia and therefore this type of search should only be done
without a warrant in the most exigent circumstances. If this same defendant had been arrested at his home two hours
after the sexual assault, it may not fall into the same exigent circumstances.

 9