STATE of Missouri, Respondent,

v.

Thomas W. HEYER, Appellant.

No. 71452.

Missouri Court of Appeals,
Eastern District,
Division One.

Jan. 20, 1998.

Motion for Rehearing and/or Transfer to
Supreme Court Denied March 18, 1998.

Nick A. Zotos, Fabbri & Zotos, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Christine M. Blegen, Asst. Atty. Gen., Jefferson City, for respondent.

GARY M. GAERTNER, Judge.

Appellant, Thomas Heyer ("defendant") appeals the judgment of the Circuit Court of Franklin County after the court found him guilty of possession of controlled substance with intent to distribute or deliver or sell, RSMo section 195.211 (1994), and sentenced him to five years imprisonment. We affirm.

On April 13, 1995, the Franklin County Sheriff's Department set up a drug enforcement checkpoint at the eastbound exit 242 ramp on Interstate 44, where Highway AH crosses the interstate. The sheriff's department placed two signs along Interstate 44, about one-quarter mile before the checkpoint area. The signs read "Drug Enforcement Checkpoint 1 Mile Ahead." The checkpoint area was selected because there was no services, food, gas, or lodging, so eastbound motorists would have little reason to leave Interstate 44. Contrary to the two signs, the sheriff's department set up the actual checkpoint at the top of the eastbound exit 242 ramp.

The drug enforcement checkpoint was operated pursuant to a written plan provided to the officers. The plan stated:

"The signs are placed prior to the exit ramp [checkpoint stop] in an attempt to divert suspected drug trafficers [sic] to the actual checkpoint area locate [sic] at the top of the overpass. Only vehicles which exit the eastbound lanes of Interstate 44 will be involved in the checkpoint as the vehicles may be exiting to avoid going through the checkpoint '1 mile ahead.' The exception [are] those which attempt to exit then return to the eastbound lanes, a chase car will be sent to stop them ... "

On April 13, 1995, Reserve Deputy Harry Tongay was stationed at the top of the ramp at the checkpoint area where he could observe vehicles approaching the exit. Around 10:00 a.m., Tongay observed a two-tone, black and gray Ford pick up truck with a camper shell. The truck had Pennsylvania license plates. The truck had its turn signal on and was approximately halfway out of the travel lane onto the ramp area when it reentered the flow of traffic on Interstate 44. After observing the truck attempt to exit then return to the eastbound lanes, Tongay, as called for in the plan, called for the pursuit car to stop the truck. Tongay spoke with Deputy Kenneth Hotsenpiller and gave him a description of the truck.

Hotsenpiller stopped the truck about one-half mile east of the checkpoint area. William Olsen was driving the truck. Defendant was the passenger. Defendant's dog was also in the truck.[1] Hotsenpiller asked Olsen for his driver's license and asked Olsen to step out of the truck. Defendant remained in the truck. Hotsenpiller then took Olsen to his patrol vehicle to run a record check. While waiting for the records check, Hotsenpiller advised Olsen the sheriff's department was operating a drug checkpoint, then explained to Olsen they had stopped him because he veered back onto Interstate 44. Hotsenpiller asked Olsen if he had any firearms, alcohol, or illegal drugs in his truck, and advised him if he had a misdemeanor amount of drugs in his possession they would seize the evidence and Olsen would be issued a summons to appear at a later date. Olsen responded he had eight pounds of marijuana in his possession. At that point, Hotsenpiller called for Deputy Pracht and Detective Guenther to come to his and Olsen's location. When Pracht and Guenther arrived, they took Olsen into custody then transported him back to the checkpoint area.

Hotsenpiller returned to Olsen's truck, informed defendant that Olsen had advised him

---

1. Defendant's dog was a female Boxer named "Gracie."

there were drugs in the truck, and further advised defendant they were going back to the checkpoint area. Hotsenpiller drove defendant back to the checkpoint area in Olsen's truck, during which time he advised defendant of his *Miranda* rights. Olsen initially said he was just along for the ride but then declined to make a statement. When they arrived at the checkpoint area, defendant was again advised of his *Miranda* rights. Defendant declined to make a statement and was placed in the jail transport van. Defendant's dog remained in the truck.

Olsen refused to give his consent to search the truck, so a drug dog was used to sniff the outside of the truck for the presence of illegal drugs. The drug dog alerted the officers to the presence of illegal drugs in the truck by scratching on the tail gate.[2] Thereafter, the officers conducted a search of the inside of the truck. They recovered three duffle bags containing thirteen bundles of marijuana, weighing 128.80 pounds, in the bed of the trunk. When Hotsenpiller attempted to search the inside of the truck, defendant's dog, who was still inside, snapped at him. Defendant was then allowed to retrieve his dog from the truck and take the dog back to the jail transport van.

Following the search of the truck, the Chief of Detectives for the Franklin County Sheriff's Department, Russell Rost, was called out to the checkpoint area. Hotsenpiller briefed Rost regarding the stop and advised him defendant had been informed of his rights and did not want to speak with anyone. Rost went to the jail transport van and advised defendant they were waiting for the DEA agent to arrive and defendant would be booked for possession of a controlled substance. Rost also told defendant arrangements would be made for the Franklin County Humane Society to take care of his dog. At that point, defendant told Rost he had been hired to drive the truck for $2,000, gave Rost $1,805 in cash he still had, and told Rost he was not present when the marijuana was loaded.

A preliminary hearing was conducted on July 6, 1995, following which defendant was formally charged with possession of a con-

trolled substance with intent to distribute or deliver or sell. On August 28, 1995, defendant filed motions to suppress the evidence and his statements. In his motion to suppress the evidence, defendant alleged the evidence was obtained pursuant to an unlawful search and seizure and that he was arrested without probable cause. In his motion to suppress his statements, defendant argued the length and nature of his interrogation and the conditions under which he was detained were inherently coercive. Defendant claimed he was induced to make statements by promises, either explicit or implied, of leniency.

A hearing on the motion to suppress was conducted March 15, 1996. Tongay testified he had worked full-time with the Sheriff's Department from 1987 through 1992, and then remained with the department as a reserve officer. He participated with the drug interdiction program "once or twice" before April 13, 1995. Tongay testified although the plan stated the deputies were to stay out of sight, in order for him to see the vehicles that might come up the ramp he had "to be visible to a certain amount." Tongay was wearing his full uniform which included his hat, and testified he was "possibly" seen from the chest up by vehicles on eastbound Interstate 44. Additionally, Tongay testified there were several patrol cars parked along the on-ramp on the opposite side of the checkpoint exit. Tongay testified as he was watching down the ramp toward Interstate 44, he observed Olsen's truck "had a turn signal on, attempted to come up the exit ramp, then changed their mind, and went back out onto the flow of traffic on eastbound 44." Tongay further testified Olsen's truck was "approximately halfway out of the travel lane onto the ramp," that "about half of the vehicle [was] off of the Interstate 44 and onto the exit ramp" when the truck veered back onto Interstate 44.

Hotsenpiller testified, after receiving a call from Tongay, he stopped Olsen's truck. Hotsenpiller testified, while he and Olsen were in the patrol car waiting for the records check, Olsen "was getting kind of nervous."

---

**2.** The drug dog was a male named "Magnum."

Olsen subsequently told him he had "eight pounds" in his possession. Hotsenpiller testified he advised defendant of his constitutional rights when he drove defendant back to the checkpoint area. Defendant thereafter volunteered he had just been along for the ride. Hotsenpiller testified he reminded defendant of his constitutional rights and defendant replied he did not want to make a statement.

Rost testified that, when he arrived at the checkpoint area, Hotsenpiller told him defendant had been advised of his rights and did not want to make a statement, and defendant and his dog were in the transport van. Rost testified he went to the van to see defendant because he was concerned about the way defendant was secured. Rost also went to see defendant to reassure him his dog would be taken care of. Hotsenpiller had told Rost defendant was concerned about his dog. Rost testified when he approached defendant he advised him they were waiting for the DEA agent to arrive and the Franklin County Humane Society could take care of his dog, or arrangements could be made to send the dog home. Rost testified that, as he explained to defendant what arrangements could be made for his dog, defendant volunteered "this was really stupid," then said he had just been paid to drive. Rost testified he reminded defendant of his rights, and defendant responded that he did not mind talking to Rost. Defendant then told Rost he had been paid $2,000 to drive the truck and handed him $1,805 in cash.

Defendant testified at the time Tongay observed them start to leave Interstate 44, he and Olsen were planning to stop for something to eat. Olsen decided not to get off at the checkpoint area because there were no restaurants at that exit. Defendant testified that, when Rost approached him, Rost told him he was going to jail and the dog was going to be put away. Defendant testified, in essence, he only told Rost about his involvement because of his concern for the welfare of his dog.

The trial court denied defendant's motions to suppress the evidence and his statements. The case was thereafter submitted by stipulation on July 10, 1996.

On October 18, 1996, the trial court entered a finding of guilt and sentenced defendant to five years imprisonment. Defendant appeals raising three points.

■ Defendant's first point on appeal is his claim the trial court erred in denying his motion to suppress the drug evidence because the truck he was riding in was not lawfully stopped. Defendant emphasizes the facts Hotsenpiller did not personally observe the truck as it approached the checkpoint area and Tongay was a reserve officer. Defendant also suggests the stop violated his Fourth Amendment rights because the plan allowed Tongay too much discretion.

■ On a motion to suppress, the state bears the burden of showing by a preponderance of the evidence that the motion should be denied. *State v. Hoopingarner*, 845 S.W.2d 89, 92 (Mo.App. E.D.1993). The trial court's ruling on a motion to suppress evidence will be affirmed unless it is clearly erroneous. *State v. Milliorn*, 794 S.W.2d 181, 183 (Mo.banc 1990). If the ruling is plausible, in light of the record viewed in its entirety, we will not reverse, even if convinced we would have weighed the evidence differently. *Id.* at 184. Rather, we review the factual findings only to determine if they are supported by substantial evidence, viewing the facts in the light most favorable to the trial court's ruling and disregarding contrary evidence and inferences. *Hoopingarner*, 845 S.W.2d at 92. With the above standard of review in mind, we find the trial court did not err in denying defendant's motion to suppress the drug evidence.

■ Checkpoint stops, such as the stop in this case, constitute a "seizure" under the Fourth Amendment. *State v. Damask*, 936 S.W.2d 565, 570 (Mo.banc 1996). As the Fourth Amendment prohibits only "unreasonable" seizures, the question becomes whether the seizure was "reasonable." *Id.* The reasonableness of a checkpoint-type seizure depends upon the balance between the public interest in preventing crime and the motorist's right to be free from arbitrary interference by law enforcement officials. *Id.* at 571. In addressing this balance, courts must weigh three factors: (1) the gravity of

the state's interest served by the checkpoint; (2) the checkpoint's effectiveness in advancing that interest; and (3) the degree the checkpoint interferes with or intrudes upon motorists. *Id.*

Applying the first prong of the above test, we find the state's interest in reducing drug trafficking is "beyond serious dispute." *Id.* The second prong, the checkpoint's effectiveness, is not a question of whether the checkpoint is the most effective means of achieving the objective. *Id.* The choice among reasonable alternatives remains with the government officials "who have a unique understanding of, and a responsibility for, limited public resources," including police officers. *Id.* at 571–72. Rather, it is sufficient evidence of reasonableness where the state can show similar checkpoints effectively advanced the state's interests, and the checkpoint in question was substantially similar. *Id.* at 573. Here, the checkpoint was substantially similar to the checkpoint found to be effective in *Damask.* Furthermore, the checkpoint in question effectively advanced the State's interest in reducing drug trafficking even if Olsen was the only motorist apprehended. As the trial judge rightly stated, "[t]he amount of drugs in this case [over 128 pounds of marijuana] is intolerable."

The third and last prong requires an examination of the intrusion the checkpoint imposes upon motorists. "In making this examination, the courts look at both the objective and subjective intrusion that the motorist encounters." *Id.* at 573. The degree of objective intrusion looks at factors such as how long the motorist was detained and the intensity of the investigation. *Id.* The degree of subjective intrusion looks at the amount of discretion available to the officers in operating the checkpoint and the extent the stop may generate concern or fright on the part of the motorist. *Id.* "A constitutionally permissible checkpoint will be designed so as to *minimize* both interference with legitimate traffic and the *amount of discretion* the field officers may wield in operating

the checkpoint." *Id.* at 573–74 (emphasis ours).

Defendant takes issue with the third prong of the above test, in particular, with the amount of discretion that was available to the officers operating the checkpoint. In sum, defendant contends the plan gave the officers too much discretion with regard to determining which vehicles attempted to exit at the checkpoint area. Defendant suggests that following *Damask,* plans such as the one in this case must eliminate *all discretion* on the part of the law enforcement officials. We do not read *Damask* that narrowly. While the *Damask* court found the subjective intrusion of each checkpoint at issue was minimal, and the plans eliminated all discretion as to which cars would be stopped, the court did not state these plans *must eliminate all discretion* on the part of the law enforcement officials. *See id.* at 573–74.

The plan employed in this case was substantially similar to the plan praised in *Damask,* which was to stop all vehicles at the top of the eastbound exit 242 ramp. *Id.* at 568. Here, the plan simply added the additional element that vehicles which "attempt to exit then return to the eastbound lanes" would also be stopped. Therefore, in this case, in addition to stopping all vehicles that did exit, all vehicles which attempted to exit, presumably to avoid the fictitious checkpoint one mile ahead, but returned to the traveled portion of Interstate 44, presumably because the driver saw the actual checkpoint at the top of the exit ramp and wished to avoid the stop, were apprehended as well. The only discretion the officers exercised was in determining which vehicles attempted to exit. We find the amount of discretion wielded by the officers in this matter was minimal. Almost as significant is the fact this minimal discretion was properly exercised. Defendant testified Olsen had his turn signal on and was going to exit then returned to the interstate. Tongay testified he observed Olsen's vehicle about half off of Interstate 44 and onto the exit ramp when the driver went back onto eastbound Interstate 44.[3] Under these cir-

---

3. While we agree with the dissent insofar as it distinguishes the "strong facts" found in the cases cited therein from defendant's and driver's action in the instant case, we reach the inescapable conclusion the latter's action, albeit less extreme, was nonetheless evasive. To require

cumstances, we find the amount of discretion given the officers in this case did not exceed the parameters set out in *Damask*.[4] To conclude law enforcement officers could not exercise a minimal amount of discretion in situations such as this would require us to ignore the fact law enforcement officers are specially trained in such matters.

As a final matter, we find the initial stop was lawful as Tongay had a reasonable suspicion, based upon specific and articulable facts, that defendant was involved in criminal activity. *See State v. Huckin*, 847 S.W.2d 951, 954 (Mo.App. S.D.1993) (noting reasonable suspicion may arise from "an observation of conduct not constituting a traffic violation but merely an unusual operation of the vehicle"). Tongay observed the "unusual operation" of the pick-up truck defendant was in; the truck approached the checkpoint area with its right-hand turn signal on, came approximately half-way out of the Interstate 44 travel lane and onto the exit ramp, then pull back onto Interstate 44. Hotsenpiller confirmed this behavior was suspicious.

Defendant's second point on appeal is his claim the trial court erred in failing to suppress the drug evidence because subsequent to the initial stop, there were insufficient grounds to warrant further detention for an "extensive investigation." Defendant claims his detention went beyond the requirements of a normal investigatory type and therefore constituted an unreasonable seizure.

As stated in point one, we find the initial stop was lawful. During such a stop, Hotsenpiller was permitted to conduct a "brief investigation" reasonably related to the stop such as asking Olsen for his driver's license and registration, asking him to come and sit in the patrol car, and asking him about his destination. *State v. McNaughton*, 924 S.W.2d 517, 523 (Mo.App. W.D.1996). Additionally, an officer may at any time ask a driver if he or she has contraband in the vehicle. *State v. Valdez*, 886 S.W.2d 182, 185 (Mo.App. S.D.1994). If the stop extends be-

yond the time reasonably necessary to achieve its original objective, it may lose its lawful character, unless a new factual predicate for reasonable suspicion of another crime is found during the period of lawful seizure. *State v. Logan*, 914 S.W.2d 806, 808 (Mo.App. W.D.1995).

Defendant's claim the stop exceeded the permissible time limit is not compelling. First, defendant failed to identify when he considered the "brief investigatory stop" to have ended and the "further detention" to have begun. Furthermore, the evidence supports a finding it was during this permissible brief investigation period that Olsen's actions made Hotsenpiller suspicious Olsen and defendant were involved in illegal activity. Hotsenpiller testified Olsen acted nervous, his hands shaking and eyes rolling, and responded "I don't know" when asked why he attempted to exit at the checkpoint area but then changed his mind. Most notably, when asked if he had a misdemeanor amount of drugs, Olsen responded, "Yes, eight pounds." Therefore, even were we to conclude the stop extended beyond the time necessary to achieve its original objective, a new factual predicate for reasonable suspicion of another crime was found during the initial period of detention. Hotsenpiller testified he was waiting for the records check to come back when Olsen admitted to having "eight pounds" in his possession.

Defendant's third and last point on appeal is his contention the trial court erred in failing to suppress his statements to Rost because the statements were coerced by the "subtle discussion" about his dog, and were made after he invoked his right to remain silent.

Once an accused invokes his Fifth Amendment right to remain silent, he may not be subjected to further interrogation until counsel is provided, unless he initiates further communications. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981). "Interroga-

suspects to behave flagrantly before they could be stopped would merely reward criminals for surreptitiousness.

4. Nor did the plan violate the "explicit, neutral limitations" requirement set forth in *Brown v. Texas*, 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979).

tion" refers to any words or actions on the part of the law enforcement official that the law enforcement official knows is "reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980); *State v. Wade*, 866 S.W.2d 908, 911 (Mo.App. W.D.1993).

■ Rost and defendant give differing versions of their conversation on April 13, 1995. Rost's explanation was he approached defendant because he was concerned about the way defendant was being held, and because he knew defendant was concerned about his dog and wanted to reassure him. We find this conversation did not constitute an "interrogation" as advising defendant his dog would be taken care of was not "reasonably likely to elicit an incriminating response from defendant." *Innis*, 446 U.S. at 301, 100 S.Ct. at 1689–90. Instead, reassuring defendant his dog would be provided for, and thus alleviating defendant's concerns, would more likely reduce the possibility defendant would make an incriminating statement. As noted, defendant's testimony conflicted with Rost's on this matter. The trial court plainly found Rost to be the more credible witness. We give deference to the trial court in judging the credibility of a witness. *Pinnell v. Jacobs*, 873 S.W.2d 925, 928 (Mo.App. E.D. 1994).

■ Additionally, the record reflects any conversation between defendant and Rost concerning the possible charges against defendant were initiated by defendant. Rost testified while he was talking to defendant about his dog, defendant changed the subject and volunteered to Rost his involvement with the drugs seized. Rost reminded defendant he had invoked his right to remain silent, after which defendant continued talking about his involvement, telling Rost he did not mind talking with him about the matter. An exception to the rule regarding questioning after the accused invokes his right to remain silent exists where the accused initiates further communication. *Edwards*, 451 U.S. at 484–85, 101 S.Ct. at 1884–85; *State v. Bittick*, 806 S.W.2d 652, 655 (Mo.banc 1991).

Based upon the foregoing, the judgment of the trial court is affirmed.

GRIMM, P.J., dissents in separate opinion.

PUDLOWSKI, J., concurs.

GRIMM, Presiding Judge, dissenting.

I respectfully dissent. The stopping of the vehicle in which defendant was riding on Interstate 44 did not satisfy the requirements of *Brown v. Texas*, 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357, 362 (1979) or *State v. Damask*, 936 S.W.2d 565, 573 (Mo.banc 1996).

In order for a seizure, such as that which occurred here, to be lawful, *Brown* requires "that the seizure must be carried out pursuant to a plan embodying *explicit, neutral limitations on the conduct of individual officers.*" *Brown*, 443 U.S. at 51, 99 S.Ct. at 2637 (emphasis added). In *Damask*, our supreme court stated that the checkpoint "will be designed so as to minimize both interference with legitimate traffic and the amount of discretion the field officers may wield in operating the checkpoint." *Damask*, 936 S.W.2d at 573–74.

Here, the plan provided for a checkpoint at the top of an overpass off of I–44. The part of the plan on which the State relies for this defendant's stop says, "[t]he exception of (sic) those which *attempt to exit* then return to the eastbound lanes, a chase car will be sent to stop them." (emphasis added). The "attempt to exit" language is not an explicit, neutral limitation on the officer's conduct, for it grants the officer unbridled discretion in determining what actions constitute an "attempt to exit."

The State's brief does not direct us to any case which involved, much less approved, a plan with the discretionary language quoted above. Nor has my independent research disclosed any. Thus, I would hold that the plan did not meet the requirements of *Brown* and the subsequent stop violated defendant's Fourth Amendment rights.

The State attempts to justify this stop by arguing that "the avoidance of a law enforcement checkpoint has been found to constitute sufficient cause, arousing a reasonable suspicion, for an investigatory stop of a vehicle."

It relies on four cases, *Brown v. Commonwealth*, 17 Va.App. 694, 440 S.E.2d 619 (1994); *Commonwealth v. Eaves*, 13 Va.App. 162, 408 S.E.2d 925 (1991); *Commonwealth v. Metz*, 412 Pa.Super. 100, 602 A.2d 1328 (1992); and *Stanley v. State*, 191 Ga.App. 603, 382 S.E.2d 686 (1989). None of the four involved a drug checkpoint and each is easily distinguished.

In *Brown v. Commonwealth*, state troopers were conducting a "traffic checking detail" on a two-lane highway. The checkpoint site was on one side with three marked and one unmarked police vehicles and was designed to catch drivers who were driving without a license or whose license was suspended. A trooper saw a vehicle stop 450 feet from the checkpoint, saw the driver leave the driver's seat and change places with a passenger from the back seat. The car then made a U-turn and went a short distance into a diner parking lot, where the officer stopped the car. The trooper asked for the former-driver's driver's license and learned that it was suspended. *Brown v. Commonwealth*, 440 S.E.2d at 620.

That court recognized that each instance of police conduct must be judged for reasonableness in light of the particular circumstances. *Id.* at 621. It held that the defendant's "act of stopping, switching drivers, and making a U-turn after seeing the checkpoint had the appearance of evasive action." *Id.* at 622. These actions gave the trooper a reasonable basis to suspect that the defendant's "license was suspended or that he was an habitual offender." *Id.*

Next, the State relies on *Commonwealth v. Eaves*. As in the previous case, an officer was conducting a checkpoint for driver's licenses. The officer saw two vehicles essentially abreast of one another approaching him. All of a sudden, the vehicle in the *left* lane "put on his signal 'right at' a turn or deceleration lane leading into a crossover, made a U-turn, and headed back in the northbound lane in the direction from which he had come." *Commonwealth v. Eaves*, 408 S.E.2d at 927. The officer testified "he stopped the vehicle because of the manner in which the operator made the U-turn, because the turn was abrupt and because the signal

was given at the last moment before the turn was executed." *Id.* These factors caused the officer to suspect that the driver was taking evasive action because he was operating his vehicle in violation of the licensing laws. *Id.* The court held that under the circumstances, the officer "possessed reasonable suspicion that [the defendant's] purpose in turning was to avoid the roadblock" set up for checking driver's licenses. *Id.*

The third case, *Commonwealth v. Metz*, involves a roadblock set up to check for motor vehicle registration, proof of insurance, and driver's license. The roadblock was at the entrance to a housing project, and marked police vehicles were present. A car came up to the check area, "came to a sudden stop and immediately started to back up and pull away from the officers. The officers immediately pursued the car and stopped it." *Commonwealth v. Metz*, 602 A.2d at 1329. The *Metz* court held "that a motorist's avoidance or attempt to avoid a police roadblock must be coupled with other articulable facts in order to give a police officer reasonable suspicion that the motorist is in violation of the Vehicle Code or that criminal activity is afoot." *Id.* at 1335.

The last case cited by the State is *Stanley v. State*. In that case, police officers established a roadblock in Atlanta, Georgia. They observed the defendant "drive toward the roadblock, stop abruptly, and back approximately six to eight car lengths down the street away from the roadblock." *Stanley v. State*, 382 S.E.2d at 686. The officers chased the defendant and cited him for improper backing, and ultimately arrested him for DUI and other offenses. *Id.* The court held that the defendant's "evasive action upon seeing a police roadblock and his backing of the automobile in apparent violation of [a Georgia statute] were 'sufficient to provide reasonable suspicion that appellant was, or was about to be, engaged in criminal activity. The officers were authorized to stop the automobile and question appellant. Therefore, the arrest following [observation of appellant's behavior consistent with DUI was] valid.'" *Id.* at 687. (internal citation omitted).

In contrast with the strong facts in those four cases involving licensing stops, the facts

disclose here that there was a sign on the interstate saying "Drug Enforcement Checkpoint 1 Mile Ahead." All the officer saw was a Ford pickup truck with its right turn signal on pull into the exit lane of the interstate. The vehicle then went back into the regular lane of traffic. The officer testified that based solely on "the hesitation and the change" in lanes, he sent a pursuit car to stop defendant's car.

Certainly, the strong facts in the first three cases relied on by the State would give a reasonable basis for suspecting that a defendant's *license* was suspended. And in the fourth case, the defendant not only took evasive action, he also apparently violated a Georgia statute. It is a quantum leap from the strong facts of those cases justifying a stop in those situations to the minimal facts present here to justify this stop. The few facts presented here do not give a reasonable basis to suspect that defendant was involved with *drugs*.

One final comment. In considering the third element of *Brown*, the *Damask* court said courts should look "at both the objective and subjective intrusion that the motorist encounters." *Damask*, 936 S.W.2d at 573. The degree of objective intrusion looks at factors such as how long the motorist is detained and the intensity of the investigation. *Id.* "The degree of subjective intrusion looks at [1] the amount of discretion available to the officers in operating the checkpoint and [2] the extent to which a stop may generate concern or fright on the part of lawful travelers." *Id.*

As previously pointed out, the officers operating this checkpoint had unlimited discretion to determine which vehicles attempted to exit and then returned to the regular lane. The facts in this case aptly demonstrate that the discretion was unlimited. Here, the officer acknowledged that he sent the chase car after defendant's pickup solely on "the hesitation and the change" in lanes.

Moreover, the stop on I–44 would generate concern or fright on the part of lawful travelers. When the stop occurred on this busy interstate, the officer asked the driver (defendant was a passenger) for his driver's license. The driver gave the officer his license. The officer also asked defendant for some identification and he produced it.

The officer then required the driver to get out of the pickup and took him to the rear of the pickup. At that point, he told the driver "what we were doing and asked him why he attempted to exit the ramp and then veered back onto the interstate." He then took the driver to his patrol car. The officer then engaged the driver in further questioning.

In *Damask*, the stops were not this intrusive. The one county's "initial investigation was limited to a check of license and registration and questions as to whether the driver observed the checkpoint sign and why the driver exited at that point." *Id.* at 574. In the other county, the "investigation was even more minimal." *Id.*

A traffic stop may not require probable cause. However, it does require "at least articulable and reasonable suspicion" of a violation of the law. *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660, 673 (1979). Here, the evidence does not rise to a reasonable suspicion of a violation of the law. The movement of a vehicle into and out of an exit lane does not constitute a violation of the law or give reasonable suspicion of a violation of the law. Everyday experience indicates such movements are not uncommon. The added presence of a sign does not alter that conclusion.

Instead of a reasonable suspicion, the officer merely had a hunch. However, both the United States and Missouri Constitutions require more than a hunch.

I would reverse the trial court's judgment.