For the reasons stated above, we affirm the judgment below.

HANNA and RIEDERER, JJ., concur.

**STATE of Missouri, Respondent,**

v.

**William Kent OLSON, Appellant.**

No. 72079.

Missouri Court of Appeals,
Eastern District,
Division Four.

April 14, 1998.

Motion for Rehearing and/or Transfer to
Supreme Court Denied June 4, 1998.

Application for Transfer Denied
Aug. 25, 1998.

Frank K. Carlson, Carlson & Hellman, Union, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Cristi A. Ingalsbe, Asst. Atty. Gen., Jefferson City, for Respondent.

SIMON, Judge.

William Olson, defendant, appeals the judgment entered on his conviction for possession of a controlled substance with intent to distribute or deliver or sell pursuant to Section 195.211 RSMo 1994 (all further references shall be to RSMo 1994 unless otherwise noted), for which he was sentenced to ten years imprisonment. On appeal, defendant contends that the trial court erred in

denying his motion to suppress evidence and admitting any evidence against defendant, in that defendant was subjected to a warrantless seizure not supported by a reasonable suspicion of criminal activity. We affirm.

At a hearing on a motion to suppress, the State has the burden of showing by a preponderance of the evidence that the motion to suppress should have been overruled. *State v. Franklin,* 841 S.W.2d 639, 644 (Mo.banc 1992). Our review is limited to a determination of sufficiency of the evidence to sustain the trial court's conclusion about whether the stop violated defendant's rights. *State v. Johnson,* 907 S.W.2d 311, 312 (Mo. App.1995). The trial court's decision on a motion to suppress is reviewed on appeal under an abuse of discretion standard. *State v. Milliorn,* 794 S.W.2d 181, 183[5] (Mo.banc 1990). We will reverse only if the trial court's judgment is clearly erroneous. *Id.* If the trial court's ruling is plausible in light of the record viewed in its entirety, this court may not reverse the ruling even though convinced that had it been sitting as trier of fact, it would have weighed the evidence differently. *Id.* at 184.

The underlying case was submitted pursuant to a stipulation for disposition, which preserved defendant's issues raised in his motion to suppress and stipulated to the evidence adduced at a preliminary hearing and a hearing on defendant's motions to suppress. The record reveals that on April 13, 1995, the Franklin County Sheriff's Department set up a drug enforcement checkpoint (checkpoint) at the eastbound Exit 242 ramp on Interstate 44, where Highway AH crosses the interstate. Two signs were placed along Interstate 44, approximately one-quarter mile before the checkpoint area, which read "Drug Enforcement Checkpoint 1 Mile Ahead." No services, food, gas or lodging were located at the exit. Contrary to the two signs, the actual checkpoint took place at the top of the eastbound Exit 242 ramp.

The checkpoint was operated pursuant to a written plan, which provided, in pertinent part:

Method of Operation

The AH overpass was selected because of its remote location. Eastbound travelers having passed the rest area and two St. Clair exits which offer gas, food, and lodging have little reason to exit at AH. In an attempt to establish reasonable suspicion/probable cause two signs will be placed approximately 1/4 mile west of the AH overpass on both sides of the eastbound lanes of Interstate 44. The signs will state:

"DRUG ENFORCEMENT CHECKPOINT 1 MILE AHEAD."

The signs are placed prior to the exit ramp in an attempt to divert suspected drug traffickers to the actual checkpoint locate[d] at the top of the overpass. Only vehicles which exit the eastbound lanes will be involved in the checkpoint as the vehicles may be exiting to avoid going thru the checkpoint "1 mile ahead." The exception of those which attempt to exit then return to the eastbound lanes, a chase car will be sent to stop them ... Cross traffic and westbound traffic are excluded from the checkpoint, barring any violation of Missouri State Law in which case they will be stopped. All officers will remain out of sight from east bound traffic. A uniform officer(s) will approach vehicles and stop them at the top of the exit ramp. Another uniformed officer will maintain a log containing the State and license number of every vehicle stopped at the checkpoint ...

Officers will check the driver for a valid drivers license. Drivers and/or passengers maybe interviewed separately by the officer/officers. The occupants will be informed of the following:

Officers name:

Reason for stop-Drug Enforcement Checkpoint

The driver/occupants will be asked why they exited at this location. The officers will look for signs of suspected drug trafficking. If the officer believes he has "reasonable suspicion" he will ask the driver for permission to search the vehicle and its contents

\* \* \*

In instances where the officer had "reasonable suspicion" and the driver refuses to give permission to search one or both of the departments canines will be utilized to sniff the exterior of the vehicle. If no alert is given by the canine no other investigation will be conducted. If the canine alerts thus establishing probable cause a search will be conducted of the vehicle and its contents.

\* \* \*

At the checkpoint, Reserve Deputy Harry Tongay (Tongay) was standing in full uniform, along with another deputy, just east of Highway AH, on the oncoming ramp from Highway AH to eastbound Highway 44. At approximately 10:00 a.m., Tongay observed a two-tone, black and gray Ford pickup truck with a camper shell (truck) traveling east on Interstate 44, approaching Exit 242 with its right turn signal on. The truck entered two-thirds of the way into the exit lane before reentering, just before the exit, the flow of traffic on Interstate 44. In reentering the flow of traffic on Interstate 44, the truck briefly proceeded off the traveled portion of the highway, crossing a "white line ... that marks the eastern-most edge of the exit ramp." Having observed the truck attempting to exit and then return to the eastbound lanes, Tongay called for a pursuit car to stop the truck, as per the plan. Tongay gave Deputy Kenneth Hotsenpiller (Hotsenpiller) a description of the truck.

Hotsenpiller stopped the truck approximately one-half mile east of the checkpoint area. Defendant was driving the truck, and Thomas Heyer (Heyer) was the passenger. Hotsenpiller asked defendant for his driver's license and to step out of the truck. Defendant produced a Pennsylvania driver's license and stepped to the rear of the truck. Hotsenpiller asked defendant why he attempted to exit the interstate and then veered back onto the interstate. Defendant did not answer. Hotsenpiller asked defendant if he saw the two signs, and defendant answered that he did. Hotsenpiller again asked defendant why he attempted to exit and then veered back onto the interstate and

defendant stated that he did not know. Hotsenpiller then took defendant to his patrol vehicle to run a record check. While waiting for the record check, Hotsenpiller informed defendant that the sheriff's department was operating a drug checkpoint and defendant had been stopped because he veered back onto Highway 44. Hotsenpiller asked defendant if he had any firearms, alcohol, or illegal drugs in his truck. Defendant did not respond, and Hotsenpiller noticed that defendant's hands began shaking, his lips started quivering, and eyes began to "kind of roll." Hotsenpiller again asked defendant if he had any drugs or firearms in the truck. Defendant did not respond. Hotsenpiller explained to defendant if he had a misdemeanor amount of drugs in his possession the evidence would be seized and he would be issued a summons to appear at a later date. Defendant did not respond. Hotsenpiller asked defendant if he had a misdemeanor amount. Defendant responded that he did not, he had eight pounds of marijuana in his possession. At that point, Hotsenpiller called for Deputy Pracht and Detective Guenther to come to his location. When they arrived, Pracht and Guenther took defendant into custody and transported him back to the checkpoint area.

Hotsenpiller drove the truck back to the checkpoint area. Defendant refused to give his consent to search the truck, and a drug dog was used to sniff the outside of the truck for the presence of illegal drugs. The drug dog alerted the officers by scratching the tail gate of the pickup. The officers conducted a search of the bed of the truck, recovering three duffle bags containing thirteen bundles of marijuana, weighing 128.80 pounds. Deputy Pracht read defendant his rights, and defendant indicated he understood his rights. Subsequently, Russell Rost, the chief of detectives, and special DEA agent Renfro arrived at the checkpoint. With Rost present, Renfro asked defendant if he had been read his rights and if he agreed to talk. Defendant responded affirmatively. Defendant then stated that Heyer and he had gone to California to pick up a hundred pounds of marijuana that was destined for Pennsylvania. Renfro inquired regarding details of

where the marijuana was destined to, asking defendant if he was interested in a controlled delivery in Pennsylvania. Defendant responded that he was not capable of arranging such and at that point, requested an attorney.

On July 6, 1995, a joint preliminary hearing was conducted for Heyer and defendant. Tongay testified, in pertinent part, that the morning of April 13, 1995:(1) he was doing drug interdiction on the overpass at Interstate 44 and State Highway AH, dressed in his uniform and trooper's hat; (2) he observed a "Ford pickup truck with his right turn signal on start to make the exit, then change his mind and [go] back out on the interstate;" (3) he "called to the deputy that was in charge of the drug interdiction and told him that we needed to pursue the car, that a vehicle had started up the ramp and then changed his mind;" and (4) Deputy Hotsenpiller pursued the truck that Tongay had pointed out.

On cross-examination, Tongay testified, in pertinent part, that: (1) under the drug interdiction, he was supposed to check anybody that comes up the exit ramp or tell other officers if anybody attempted to come up the ramp; (2) other officers and he were stationed on the overpass; (3) the truck started off the interstate probably half a lane into the approach but did not actually come up the exit ramp; (4) he did not notice the truck had out of state plates on it; (5) no gas stations or restaurants are located at Exit 242; (6) a vehicle approaching Exit 242 comes around a pretty broad right-hand curve; (7) a driver does not see what surrounds the ramp until close to the exit; and (8) he stopped the truck because he was supposed to notify other officers if someone attempts to come up the ramp and then proceeds to get back on the interstate and he observed the truck doing so.

Hotsenpiller testified, in pertinent part, that: (1) Tongay told him at the overpass that a truck attempted to exit and then veered back onto the interstate; (2) the truck was a two-tone Ford pickup with a camper shell; (3) Tongay pointed the truck out to Hotsenpiller after it passed under the over-

pass; and (4) Hotsenpiller pursued the truck and stopped it.

On cross-examination, Hotsenpiller testified, in pertinent part, that: (1) he was in charge of the drug interdiction checkpoint; (2) all officers working on the checkpoint previously received the plan of action and were required to follow it; (3) a copy of the plan of action was kept at the checkpoint; and (4) he stopped defendant in a marked Franklin County Sheriff's vehicle.

On July 10, 1995, defendant was formally charged with the class B felony of possession of a controlled substance with intent to distribute or deliver or sell. Subsequently, defendant waived his arraignment and entered a plea of not guilty.

On or about February 26, 1996, defendant filed a motion to suppress statements, contending that: (1) defendant's statement was not voluntary; (2) the statement was made without the defendant being advised of his constitutional rights; and (3) the statement was the direct result of an unlawful arrest. Defendant also filed a motion to suppress the evidence seized, which incorporated his motion to suppress statements and contended that: (1) the evidence the State seized was obtained pursuant to an unlawful search and seizure; (2) the search and seizure was made without authority and a search warrant; and (3) defendant's arrest was made without warrant, authority or probable cause to believe that an offense had been committed and that defendant had committed it.

On March 6, 1996, a hearing on the motions to suppress was conducted. Tongay testified, in pertinent part, that: (1) he had worked full-time with the Sheriff's Department from 1987 through 1992 and then remained with the department as a reserve officer until present; (2) he had worked drug interdiction operations in the past; (3) the morning of April 13, 1995, he was standing in full uniform and hat just east of Highway AH, far enough back where he could see anything approaching the AH exit ramp off of Interstate 44; (4) nothing was concealing his person or his uniform from the operator of the truck; (5) he observed that "the pickup truck had its turn signal on [and] made an attempt to leave Interstate 44 to come up the

ramp," traveling "two-thirds of the vehicle into the exit lane;" (6) "the vehicle ... decided to swing back out in the interstate," traveling "off of the traveled portion of the highway" and crossing the "white line ... that marks the eastern-most edge of the exit ramp;" (7) the truck continued under the overpass and eastwards on Interstate 44; and (8) he informed Hotsenpiller that he needed to pursue the truck because it had just attempted to come up the ramp. State offered into evidence two photographs of Exit 242 at AH.

Defendant requested and the court took judicial notice of the files of *State v. Heyer*, another criminal proceeding involving Heyer. On cross-examination, Tongay testified, in pertinent part, that: (1) he was located on the oncoming ramp from Highway AH to eastbound Highway 44 at the time he observed the pickup; (2) other officers were also located on this ramp; and (3) Tongay could see oncoming cars but could not necessarily easily been seen himself. Defendant offered into evidence three photographs of the approach to Exit 242. Tongay also identified and marked the truck's path of travel on two photographs of Exit 242 at AH, which were offered as defendant's evidence. Hotsenpiller testified, in pertinent part, that he pursued and stopped the truck per Tongay's directions.

The trial court found: "[The] court takes up motion to suppress evidence for ruling. Under the factual circumstances present, the officers had a reasonable, articulable suspicion that the defendant was engaged in criminal activity. Motions to Suppress Evidence and to Suppress Statements are denied."

The trial court found defendant guilty of the class B felony of possession of a controlled substance with intent to distribute or deliver or sell and subsequently sentenced him to ten years imprisonment.

In his point, defendant contends that the trial court erred in denying his motion to suppress evidence and admitting any evidence against defendant, in that defendant was subjected to a warrantless seizure not supported by a reasonable suspicion of criminal activity. Defendant contends that Tongay had only a hunch of criminal activity

because there existed a variety of neutral, innocent reasons for a motorist to drive exactly as defendant did, namely innocent travelers who would not know that Exit 242 contained no facilities until they were right on top of the exit.

We initially note this specific checkpoint plan has been previously addressed in *State v. Heyer*, 962 S.W.2d 401, 406–07 (Mo.App. E.D.1998). In *Heyer*, the passenger in the truck, Heyer, appealed the judgment entered on his conviction for possession of a controlled substance with intent to distribute. On appeal, we affirmed the judgment, finding that the checkpoint stop pursuant to the plan was reasonable under the test articulated in *State v. Damask*, 936 S.W.2d 565 (Mo.banc 1996), and Tongay had a reasonable suspicion, based upon specific and articulable facts, that Heyer was involved in criminal activity. A dissent was filed, which found that the evidence presented did not rise to a reasonable suspicion of a violation of the law, and the checkpoint was more intrusive than the checkpoint approved in *Damask*.

■ An investigative stop is permitted under the Fourth Amendment when a law enforcement officer is able to point to specific and articulable facts which, taken with rational inference from those facts, create a reasonable suspicion that criminal activity is afoot, even if the officer lacks probable cause. *State v. Rushing*, 935 S.W.2d 30, 32 (Mo.banc 1996), *citing Terry v. Ohio*, 392 U.S. 1, 19–22, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968).

In *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), the United States Supreme Court discussed the *Terry* requirement that an officer have "a reasonable suspicion that criminal activity was afoot:"

> The officer, of course must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch." ' The Fourth Amendment requires 'some minimal level of objective justification' for making the stop. That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable

cause means 'a fair probability that contraband or evidence of a crime will be found,' and the level of suspicion required for a Terry stop is obviously less demanding than that for probable cause.... In evaluating the validity of a stop such as this, we must consider 'the totality of the circumstances—the whole picture.' As we said in *Cortez:*

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same— and so are law enforcement officers. 449 U.S. at 418, 101 S.Ct. at 695.

■ Here, the record revealed that Tongay testified that he told Hotsenpiller to stop defendant's truck because he observed it attempting to exit and then return eastbound on Interstate 44, in violation of the plan. Evaluating the totality of the circumstances here, i.e. the signs alerting motorists of the oncoming drug checkpoint, the lack of services at Exit 242, and Tongay's observation of the truck's movements in relation to the plan and the rational inferences from those facts, we conclude that the trial court's determination that Tongay had a reasonable suspicion that defendant committed or was about to commit a crime was not clearly erroneous.

Defendant contends that there are a variety of neutral, innocent reasons for a motorist to drive exactly as he did, therefore, the facts and circumstances before Tongay did not create a reasonable and articulable suspicion of criminal activity. In support, defendant points out that motorists would not be able to tell that Exit 242 did not have any facilities until right upon the exit.

■ The circumstances leading to an authorized Terry stop do not have to exclude the possibility of innocent behavior. *State v. Fernandez,* 691 S.W.2d 267, 269 (Mo.banc 1985). In light of the totality of the circumstances, we cannot say that Tongay's suspicion that the defendant committed or was about to commit a crime was unreasonable.

JUDGMENT AFFIRMED.

ROBERT G. DOWD, Jr., P.J. and HOFF, J., concur.